ROXALANA L. GROSVENOR *vs.* UNITED SOCIETY OF BE-
LIEVERS.

MARIA F. GROSVENOR *vs.* SAME.

Suffolk.    March 10. — June 23, 1875.    AMES & ENDICOTT, JJ., absen*

The rights of a person who has been expelled from a religious society are to be de
termined by the constitution of the society.

A person who has been expelled from the "Society of Believers," commonly calle*
Shakers, cannot maintain an action for services rendered the society prior to suc*
expulsion, or for his expenses of support since separation.

A member of the "Society of Believers," commonly called Shakers, was expelled by
the ministers and elders for entertaining opinions and promulgating doctrines within
the society at variance with the established belief and subversive of the organiza
tion.  *Held*, in an action of tort for such expulsion, that under the constitution of
the society, the ministers and elders had power to expel members, and that this
court could not determine whether or not the opinions and doctrines of expelled
members were in fact inconsistent with the established belief of the society.

TWO ACTIONS OF CONTRACT to recover for services rendered to the defendant society, a religious community, commonly known as Shakers, of which the plaintiffs were members, from May 6, 1819, to August 1, 1869, when " the said society through their duly constituted officers under the rules of said society, expelled " the plaintiffs therefrom, and for damages sustained by the failure of the society to support the plaintiffs since their expulsion. The declaration also contained a count in tort. The answers alleged that the plaintiffs did not keep the covenants contained in the

constitution of the society, a copy of which was annexed, and the material parts of which are in the margin.*

---

* " COVENANT OR CONSTITUTION. — *Preamble.* — We, the brethren and sisters of the United Society of Believers, (called Shakers,) residing in the county of Worcester, and State of Massachusetts, being connected together as a religious and social community, distinguished by the name and title of the Church of the United Society, in the town of Harvard, which for many years has been established and in successful operation, under the charge of the ministry and eldership thereof, and feeling the importance not only of renewing and confirming our spiritual covenant with God and each other, but also of renewing and improving our social compact, and amending the written form thereof, do make, ordain, and declare the following articles of agreement as a summary of the principles, rules, and regulations established in the Church of the said United Society, which are to be kept and maintained by us, both in our collective and individual capacities, as a covenant or constitution, which shall stand as a lawful testimony of our religious and social compact, before all men, and in all cases of question and law relating to the possession and improvement of our united and consecrated interest, property, and estate:

" ARTICLE I. — *Of the Gospel Ministry.* — SECTION 2. *Their order and office.* We further acknowledge and declare that for the purpose of pro moting and maintaining union, order, and harmony throughout the various branches of this community, the primary administration of parental authority has been settled in the first established ministry of New Lebanon, there to rest and remain as the centre of union to all who are in Gospel relation and communion with the society. The established order of this ministry includes four persons; two of each sex.

" SECTION 4. *Of the ministerial office in the several societies or communities.* We further acknowledge and declare, covenant, and agree that the ministerial office and authority in any society or community of our faith, which has emanated, or which may emanate, in a regular line of order from the centre of union aforesaid, is, and shall be acknowledged, owned, and respected, as the spiritual and primary authority of such society or community, in all matters pertaining to the ministerial office. And in case of the decease or removal of any individual of said ministry, in any such society, his or her lot and place shall be filled by agreement of the surviving ministers in council with the elders and others, as the nature of the case may require, together with the knowledge and approbation of the primary ministerial authority at New Lebanon afore-said, to which they are responsible.

" SECTION 5. *Powers and duties of the ministry.* The ministry being appointed and established as aforesaid are vested with the primary authority of the church and its various branches. Hence, it becomes their special duty to guide and superintend the spiritual concerns of the society as a body of people under their care and government, and in connection with the elders in their respective families and departments, who shall act in union with them, to give

The cases were tried together in this court, before *Endicott*, J., who reported them to the full court in substance as follows: It

and establish such orders, rules, and regulations as may be found necessary for the government and protection of the church and society within the limits of their jurisdiction, and also to counsel, advise, and judge in all matters of importance, whether spiritual or temporal. The said ministry are also invested with authority, in connection with the elders as aforesaid, to nominate and appoint to office ministers, elders, deacons, and trustees, and to assign offices of care and trust to such brethren and sisters as they, the said ministers and elders, shall judge to be best qualified for the several offices to which they may be appointed; and we do hereby covenant and agree that such nominations and appointments being made and officially communicated to those concerned, and receiving the general approbation of the church, or of the families concerned, shall thenceforth be confirmed and supported, until altered or revoked by the authority aforesaid.

" ARTICLE II. — *Institution of the Church.* — SECTION 1. *The object and design of church relation.* We further acknowledge and declare that the great object, purpose, and design of our uniting ourselves together as a church or body of people, in social and religious compact, is faithfully and honestly to occupy, improve, and diffuse the various gifts and talents, both of a spiritual and temporal nature, with which Divine wisdom has blest us for the service of God, for the honor of the Gospel, and for the mutual protection, support, comfort, and happiness of each other as brethren and sisters in the Gospel, and for such other pious and charitable purposes as the Gospel may require.

" SECTION 2. *Who are not admissible into church relation.* As the unity, stability, and purity of the church essentially depend on the character and qualifications of its members, and as it is a matter of importance that it should not be incumbered with persons who are under any involvement or incapacity, natural or moral : Therefore, no member of any company or association in business or civil concern, no copartner in trade, no person under any legal embarrassment or obligations of service, no minor, no slave or bond-servant, no insane person, no profane person, nor any person who lives in the wilful violation of the known and acknowledged principles of moral conduct, shall be deemed qualified for admission into the covenant relation and communion of the church.

" SECTION 3. *Preparation for admission into church relation.* In order that believers may be prepared for entering into the sacred privilege of church relation, it is of primary importance that sufficient opportunity and privilege should be afforded under the ministry of the Gospel for them to acquire suitable instruction in the genuine principles of righteousness, honesty, justice, and true holiness, and also that they should prove their faith and Christian morality by their practical obedience to the precepts of the Gospel according to their instructions. It is also indispensably necessary for them to receive

appeared in evidence that in May 1819 the two plaintiffs, being then of eight and six years of age, respectively, went with their

---

the one uniting spirit of Christ, and to become so far of one heart and one mind, that they are willing to sacrifice all other relations for this sacred one. Another essential step is to settle all just and equitable claims of creditors and filial heirs, so that whatever property they may possess shall be justly their own. When this is done, and they feel themselves sufficiently prepared to make a deliberate and final choice, to devote themselves, with all they possess, wholly to the service of God, without reserve, and it shall be deemed proper by the leading authority of the church, after examination and due consideration, to allow them to associate together in the capacity of a church or a branch thereof in gospel order, they may then consecrate themselves and all they possess to the service of God forever, and confirm the same by signing and sealing a written covenant predicated upon the principles herein contained, and fulfilling, on their part, all its obligations.

" SECTION 4. *Admission of new members.* As the door must be kept open for the admission of new members into the church, when fully prepared, it is agreed that each and every person who shall at any time after the date and execution of the church covenant, in any branch of the community, be admitted into the church as a member thereof, shall previously have a fair opportunity to obtain a full, clear, and explicit understanding of the object and design of the church covenant, and of the obligations it enjoins upon the members. For this purpose, he or she shall, in the presence of two of the deacons or acting trustees of the church, read, or hear the same distinctly read, so as to be able freely to acknowledge his or her full approbation and acceptance thereof in all its parts. Then he, she, or they (as the case may be) shall be at liberty to sign the same; and having signed and sealed it, and being subject to all the obligations required of the original signers, shall thenceforth be entitled to all the benefits and privileges thereunto appertaining; and the signature or signatures thus added shall be certified by the said deacons or trustees, together with the date thereof.

" SECTION 5. *Concerning youth and children.* Youth and children, being minors, cannot be received as members of the church possessing a consecrated interest in a united capacity, yet it is agreed that they may be received under the immediate care and government of the church, at the desire or consent of such person or persons as have a lawful right to or control of such minors, together with their own desire or consent. But no minor under the care of the church can be employed therein for wages of any kind.

" ARTICLE III. — *Of the Trusteeship.* — SECTION 2. *Duties of the trustees.* It is and shall be the duty of the said deacons or acting trustees to improve, use, and appropriate the said united interest for the benefit of the church in all its departments; and for such other religious and charitable purposes as the Gospel may require; and also to make all just and equitable defence in law for the protection and security of the consecrated and united

father, mother and two brothers to live with the society; that on
June 11, 1834, both being then over twenty-one years of age,

---

interest, rights, and privileges of the church and society, jointly and severally
as an associated community, as far as circumstances and the nature of the
case may require: *Provided, nevertheless*, that all the transactions of the said
deacons or acting trustees, in the use, management, protection, defence, and
disposal of the aforesaid interest shall be for the benefit and privilege and in
behalf of the church or society as aforesaid; and not for any private interest,
object, or purpose whatever.

" ARTICLE IV. — *Of the Eldership.* — SECTION 1. *Choice and appointment
of elders.* The united interests and objects of believers established in Gospel
order, require that elders should be chosen and appointed for the spiritual
protection of families, whose business it is to take the lead in their several de-
partments in the care and .government of the concerns of the church and of
the different families established in and pertaining to the society. Their num-
ber and order should correspond with that of the ministry. They are required
to be persons of good understanding, of approved faithfulness and integrity,
and gifted in spiritual administration. They must be selected and appointed
by the ministry, who are to judge of their qualifications.

" SECTION 2. *Duties of the elders.* As faithful watchmen upon the walls of
Zion, it becomes the duty of the elders to watch over their respective fami-
lies; to instruct the members in their respective duties; to counsel, encourage,
admonish, exhort, and reprove as occasion may require; to lead the worship;
to be examples to the members of obedience to the principles and orders of the
Gospel, and to see that the orders, rules, and regulations pertaining to their
respective families or departments are properly kept.

" ARTICLE V. — *Of Family Deacons and Deaconesses.* — SECTION 1. *Their
qualifications and appointments.* The office of family deacons and deaconesses
has long been established in the church, and is essentially necessary for the
care, management, and direction of the domestic concerns in each family,
order, or branch of the church. They are required to be persons of correct
and well grounded faith in the established principles of the Gospel, faithful
in duty, closely united to their elders, and of sufficient capacity in business.
Of the qualifications the ministry and elders by whom they are chosen and ap-
pointed must be the judges. Their number in each family is generally two of
each sex, but may be more or less, according to the size of the family and the
extent of their various duties.

" SECTION 2. *Their duties and obligations.* The deacons and deaconesses
of families are intrusted with the care and oversight of the domestic concerns
of their respective families. It is their duty to make proper arrangements in
business; to maintain good order; watch over, counsel, and direct the mem-
bers in their various occupations, as occasion may require; to make applica-
tion to the office deacons or trustees for whatever supplies are needed in the
several departments of the family; to maintain union, harmony, and good un-

they signed the said covenant or constitution, and thereby became covenant members of the society so called, entitled to the rights

---

derstanding with the said office deacons; and to report to their elders the state of matters which fall under their cognizance and observation.     But their power is restricted to the domestic concerns of their respective families and departments, and does not extend to any immediate or direct correspondence with those without the boundaries of the church.   They have no immediate concern with trade and commerce; therefore it is not their business to buy and sell, nor in any way to dispose of the property under their care, except with the counsel and approbation of the trustees.

" ARTICLE VI. — *Privileges and Obligations of Members.* — SECTION 1. *Benefits and privileges of members in church relation.*   The united interest of the church having been formed and established by the freewill offerings and pious donations of the members respectively, from the commencement of the institution, for the object and purposes already stated, it cannot be considered either as a joint tenancy or a tenancy in common, but as a consecrated whole, designed for and devoted to the uses and purposes of the Gospel forever, agreeable to the established principles of the church: Therefore it shall be held, possessed, and enjoyed by the church, in their united capacity, as a sacred and covenant right: That is to say, all and every member thereof, while standing in Gospel union and maintaining the principles of this covenant, shall enjoy equal rights, benefits, and privileges, in the use of all things pertaining to the church, according to their several needs and circumstances ; and no difference shall be made on account of what any one has contributed and devoted, or may hereafter contribute and devote to the support and benefit of the institution.

" SECTION 2. *Proviso.*   It is nevertheless stipulated and agreed that the benefits, privileges, and enjoyments secured by this covenant to the members of the church, shall not be considered as extending to any person who shall refuse to comply with the conditions of this association; or who shall refuse to submit to the admonition and discipline of the constituted authority of the church; or who shall wilfully depart from the principles and practice of those religious and moral obligations which have been established in the church, agreeable to the primitive faith and distinguished principles of this institution; of which refusal or non-compliance the leading authority acknowledged in the first article of this covenant shall be the proper and constitutional judges.

" SECTION 3. *Obligation of the members.*   As subordination and obedience is the life and soul of every well regulated community, so our strength and protection, our happiness and prosperity, in our capacity of church members, must depend on our faithful obedience to the rules and orders established in the church, and to the instruction, counsel, and advice of its leaders.   Therefore, we do hereby covenant and agree that we will receive and acknowledge, as our elders in the Gospel, those members in the church who are or may be

and subject to the obligations therein set forth; that from that time to July 26, 1865, they were members, living with the so-

---

chosen and appointed for the time being to that office and calling by the authority aforesaid; and also that we will, as faithful brethren and sisters in Christ, conform and subject ourselves to the known and established faith and principles of our community, and to the counsels and directions of the elders, who shall act in union, as aforesaid, and also to all the orders, rules, and regulations which are or may be given and established in the church, according to the principles and by the authority aforesaid.

"SECTION 5. As we esteem the mutual possession and enjoyment of the consecrated interest and privileges of the church a valuable consideration, fully adequate to any amount of personal interest, labor, or service, devoted or consecrated by any individual; we, therefore, covenant and agree, in conformity with an established and well known principle of the church, that no person whatever under its care and protection can be employed for wages of any kind, on his or her individual account, and that no ground is or can be afforded for the recovery of any property or service devoted or consecrated as aforesaid; and it is also agreed that in case of the removal of any member or members from one family, society, or branch of the church to another, his, her, or their previous signature or signatures to the church or family covenant from whence such member or members shall have removed, shall forever bar all claims which are incompatible with the true intent and meaning of this covenant, in the same manner as if such removal had not taken place. Yet all who shall so remove, in union with the authority aforesaid, shall be entitled to all the benefits and privileges of the order in which they shall then be placed, so long as they shall conform to the rules and regulations of the same.

"ARTICLE VII. — Dedication and Release. — SECTION 1. Dedication and consecration of persons, property, and service. According to the faith of the Gospel which we have received, and agreeable to the uniform practice of the Church of Christ from its first establishment in this society, we covenant and agree to dedicate, devote, consecrate, and give up, and by this covenant we do solemnly and conscientiously dedicate, devote, consecrate, and give up ourselves and services together with all our temporal interest to the service of God and the support and benefit of the church of this community, and to such other pious and charitable purpose as the Gospel may require, to be under the care and direction of such elders, deacons, and trustees as are or may be appointed and established in the church by the authority aforesaid.

"SECTION 2. Dedication and release of private claim. Whereas, in pursuance of the requirement of the Gospel, and in the full exercise of our faith, reason, and understanding, we have freely and voluntarily sacrificed all self-interest, and consecrated and devoted our persons, services, and property, as aforesaid, to the pious and benevolent purposes of the Gospel; Therefore, we do hereby solemnly and conscientiously, for ourselves and our heirs, release and quit-claim to the deacons or acting trustees of the church for the time being, for

ciety, and performing all the labor required of them and customary in the organization.    At the last mentioned date they were expelled.    It appeared that a short time before said date the ministers and elders charged them with entertaining opinions and promulgating doctrines within the society, at variance with the established belief and subversive of the organization, and a hearing was had before the ministers and elders on that subject, and they were asked to state their views ; there was much conversation on points of doctrine, and the discussion was confined to the question whether the plaintiffs were in conformity with the religious faith and doctrine of the society, the plaintiffs insisting that they were ; the plaintiffs adhered to their views, and were told if they persisted they would have to leave ; the next day they were again before the ministers and elders, and still adhering, they were told they must go to the office with their things, which was equivalent to an expulsion.    They did so, and the next day left the community.    No formal charges or charges in writing were made against them, and it was admitted by the defendant that there was no record of the proceedings.    All the ministers and elders were present on the occasions mentioned.    It was admitted at the trial by the plaintiffs that they were expelled for alleged nonconformity to the belief and doctrines of the society, though they denied that they were in fact not in conformity.

One of the plaintiffs had stated generally, the defendant objecting, that the opinions and doctrines advocated by her were not inconsistent with the established belief ; and the counsel for the plaintiffs offered to show by this and other witnesses, what

---

the uses and purposes aforesaid, all our private personal right, title, interest, claim, and demand of, in, and to the estate, interest, property, and appurtenances so consecrated, devoted, and given up; and we hereby jointly and severally promise and declare in the presence of God, and before these witnesses, that we will never hereafter, neither directly nor indirectly, under any circumstances whatever, contrary to the stipulations of this covenant, make nor require any account of any interest, property, labor, or service, nor any division thereof which is, has been, or may be devoted by us, or any of us, to the uses and purposes aforesaid, nor bring any charge of debt or damage, nor hold any claim nor demand whatever against the said deacons or trustees, nor against the church or society, nor against any member thereof, on account of any property or service given, rendered, devoted, or consecrated to the aforesaid sacred and charitable purposes."

their opinions and doctrines were, and that they were in fact in strict conformity to the established faith, and claimed the right to go to the jury on that question, and that their expulsion was wrongful. But the judge refused to admit the evidence and submit that question to the jury.

The plaintiffs also contended that under the covenant and agreement they were entitled to a maintenance and support during life from the common property of the society; that they could not be deprived thereof by reason of nonconformity to the faith of the organization; and that they were entitled to prove and recover for the value of their services for such length of time as the law allowed prior to their expulsion.

But the judge ruled on motion of the defendant that this action could not be maintained upon the facts proved and tendered in proof. No further evidence being offered, verdicts were taken for the defendant.

*C. S. Lincoln & G. W. Morse*, for the plaintiffs. 1. The primary administrator of authority in the defendant society is in the established ministry at New Lebanon. Covenant, art. 1, sect. 2. The ministerial authority in every family emanates from the central authority at New Lebanon. Art. 1, sec. 4. The ministry appointed as aforesaid have authority to make rules necessary for the government of the society. Art. 1, sec. 5. The object of the society is the mutual protection, support, comfort and happiness of the members, spiritually and temporally. Art. 2, sec. 1. The qualifications and disqualifications are enumerated in sections 2 and 3 of art. 2. Art. 2, sec. 4, provides that a member signing the covenant shall thenceforth be entitled to all the benefits and privileges of the society. Art. 3, sec. 2, and art. 5, show that this society recognizes the distinction between the society itself and the church, which is part of the society; the temporal affairs of the family being managed by the trustees, deacons and deaconesses; while the control of the spiritual affairs of the church, by art. 4, is conferred upon the elders. Art. 6, sections 1 and 2, refer to members of the family, or society, who are in church relation. The article is so headed; and sec. 1 provides that every member standing in Gospel union shall enjoy equal rights and privileges in all things pertaining to the church; and section 2 provides that the benefits, etc., secured to members of

the church, shall not extend to those who disobey the rules of the association, or who refuse to submit to the constituted authority of the church, " of which refusal or non-compliance the leading authority acknowledged in the first article of this covenant," (that is, the ministry at New Lebanon,) " shall be the proper and constitutional judges." Sec. 5 provides for the removal of a member from one family to another, when such person is in union with the authority, and apparently, also, when he is in contempt of the authority. Art. 7 provides that no member shall, contrary to the provisions of the covenant, make any claim for debt, damages, etc., against either trustees, church or society; but provides no stipulation that the members may not claim for a breach of the covenant, or for their support; to which they are entitled.

2. The defendants are a religious society within the meaning of the statutes of this Commonwealth. The members are a corporate body of proprietors of the property of the society. *Lawrence* v. *Fletcher*, 8 Met. 153. *Cogswell* v. *Bullock*, 13 Allen, 90. Gen. Sts. *c.* 30. The relations between religious societies and the church of such societies, is, that the religious society is a corporation capable of holding and managing property, etc., while the church is a voluntary association, consisting of some or all the members of such society, united by covenant or agreement mainly for purposes of celebrating the ordinance of the Lord's Supper. It is merely incident to the corporation. *Parker* v. *May*, 5 Cush. 336, 345.

3. Whatever power is given the leading authority mentioned in art. 1 of the covenant, over the ecclesiastical rights of members of the church, such power does not extend to the right of expulsion from the society itself, and a consequent deprivation of the enjoyment of the temporal rights of a member. But if the plaintiffs have been legally expelled and the action of the defendant is conclusive of that fact, such expulsion does not necessarily affect the civil rights of the plaintiffs as connected with the defendant, and they are entitled to recover for a breach of contract or upon a quantum meruit for their services, or upon their count in tort. The authority which undertook to act in expelling the plaintiffs, was not the leading authority contemplated in art. 6, namely, the New Lebanon ministry · and the action of the society, through its officers, was a breach of its contract with the plaintiffs. There

being no formal charges against the plaintiffs, and no record of the proceedings, there has been no legal expulsion of the plaintiffs, if the society or the officers had power to expel them for any cause, and as the action of the society was such as to deprive them of a peaceable enjoyment of their rights as members, — namely, a support in sickness and in health, — the defendant has committed a breach of its covenant with the plaintiffs, for which the plaintiffs are entitled to damages. If the court shall construe sec. 6 of the covenant to mean that the defendant may take young children and keep them until old age comes on, having the benefit of their services and all their contributions to the society, through the useful period of their lives, and then turn them out, as they have the plaintiffs, without form of impeachment or trial, into a world which, by the Shaker faith and practice, would be depopulated, but which, in its present state, would be forced to support such members as objects of charity, then it is submitted that that part of the covenant is contrary to public policy, and void. An expulsion from the temporal rights of the society is not anticipated by articles 6 and 7, and there is no provision in the covenant for such expulsion. It does not appear that the ministry have ever made any rules, as doubtless they might have done under art. 1, sec. 5. If art. 6 contemplates any punishment for nonconformity to the doctrines of the church, strictly considered, such punishment is only a suspension of the right of communion with the church. A private corporation cannot disfranchise a member unless the power to do so is expressly granted. *Evans* v. *Philadelphia Club*, 50 Penn. St. 107. A member of any church may be expelled from the church proper, but if he has bought a pew in the building where the society worships, and paid for it, the society cannot lawfully deprive him of the use of it without making him suitable restitution; and the courts of law will interfere to protect the rights of such member. In the case at bar all the civil rights of the plaintiffs are involved, and they are entitled to relief. *Forbes* v. *Eden*, 4 Court of Session Cases, 3d Series, 143. *Chase* v. *Cheney*, 58 Ill. 509, 537. *Ferraria* v. *Vasconcellos*, 31 Ill. 25. *Baptist Church* v. *Witherell*, 3 Paige, 296, 301. *Gable* v. *Miller*, 10 Paige, 627; *S. C.* 2 Denio, 492. *Walker* v. *Wainwright*, 16 Barb. 486. *Evans* v. *Philadelphia Club*, 50 Penn. St 107. *Hale* v. *Everett*, 53 N. H. 9. *Crocker* v. *Old South Society* 106 Mass. 489. Gen. Sts. *c.* 30, § 6.

4. The court has authority to inquire whether members expelled or those remaining are true conformists to the organized faith and established doctrines of the church and society, though only one is expelled and a thousand remain. *Miller* v. *Gable*, 2 Denio, 525. In *Waite* v. *Merrill*, 4 Greenl. 102, which is regarded by all Shakers as the great bulwark protecting them from all liability to ex-members, the plaintiff without any provocation left the society and brought a suit for his wages, not contending that the society had violated its covenant. In *Gregg* v. *Massachusetts Medical Society*, 111 Mass. 185, 193, the defendant had special power to expel members, and this court merely decided that it had no equity jurisdiction of the case as it was brought. In *Goesele* v. *Bimeler*, 14 How. 589, the plaintiffs sought to recover property which their ancestor had contributed as a member of the society of Separatists, whose covenant was similar to that of the Shakers. The court refused the relief upon the ground that the ancestor had recovered compensation for his labor and his property by the covenant of the society to support him in sickness and in health, which had been done ; and great stress is laid upon this obligation of the society.

5. It is admitted that there were no formal charges made against the plaintiffs, and none at all in writing. " No man can be deprived of his office, which is a valuable property, without having the offence with which he is charged fully and plainly, substantially and formally described to him." *Murdock's Case*, 7 Pick. 303, 330. This is so essential to justice and fairness it ought never to be dispensed with.

6. Where members have vested interests, the court will determine the validity of the by-laws of the society. *Commonwealth* v. *Worcester*, 3 Pick. 462. *Andover Free Schools* v. *Flint*, 13 Met. 539. *Evans* v. *Philadelphia Club*, 50 Penn. St. 107. The plaintiffs do not contend that the covenant is contrary to public policy and void ; but that the construction we have mentioned would render that part of it so ; while without any judicial strain it may be so construed as to give it validity, and at the same time afford relief to the plaintiffs against the society, and not cast them penniless upon a world which the society is at enmity with.

*J. P. Healy*, for the defendant. 1. The plaintiffs, having duly signed and sealed the " covenant or constitution," became bound

by all the provisions of that instrument. They thus subjected themselves to the discipline, and to all the orders, rules and regulations of the church, and to the counsels and directions of its elders. Covenant, art. 1, sec. 5 ; art. 6, sec. 3.

2. The plaintiffs were expelled from the defendant society by its duly constituted officers under the rules of said society, for an alleged promulgation of doctrines, within the society, at variance with its established belief and subversive of its organization. Of the justice of the expulsion, the duly constituted officers were the exclusive judges, and their decision is not open to revision by any other tribunal. *Farnsworth* v. *Storrs*, 5 Cush. 412. Covenant, art. 6, secs. 2, 3.

3. By the covenant the plaintiffs bound themselves, in the most explicit language, not to make any claim against the society, its officers, members or property, under any circumstances whatever, on account of any property or service given or rendered by them to the society. Covenant, art. 7, sec. 2. This contract is obligatory upon the plaintiffs, and is open to no legal or moral objection. *Waite* v. *Merrill*, 4 Greenl. 102. *Gasely* v. *Separatists' Society of Zoar*, 13 Ohio St. 144. *Goesele* v. *Bimeler*, 5 McLean, 223 ; *S. C.* 14 How. 589. *Schriber* v. *Rapp*, 5 Watts, 351.

WELLS, J. In each of these cases, the plaintiff, after arriving at full age, signed the instrument styled " Covenant or Constitution," by which the " United Society of Believers " were bound together as one body in all their religious, social and pecuniary interests. Her rights must therefore be determined by the provisions of that instrument.

1. She cannot recover for her services, either upon the written agreement or upon an implied assumpsit; because all such right is expressly and explicitly renounced.

2. She cannot recover for the expenses of her support since her separation from the community; because, whatever support she was entitled to receive under the " covenant," she was to enjoy as a member of the church so constituted, with the others, " according to their several needs and circumstances," and only " while standing in Gospel union and maintaining the principles of this covenant." It is not an absolute right of support, but a qualified and peculiar one ; the extent and manner of which can be measured and determined only by the constituted authorities of the organization thus created.

3. She is not entitled to recover damages for her expulsion from the church or society. By the " covenant," the members agree to " receive and acknowledge, as our elders in the Gospel, those members in the church who are or may be chosen and appointed for the time being to that office and calling," and to " conform and subject ourselves to the known and established faith and principles of our community, and to the counsels and directions of the elders." It is also " stipulated and agreed that the benefits, privileges and enjoyments secured by this covenant to the members of the church shall not be considered as extending to any person who shall refuse to comply with the conditions of this association; or who shall refuse to submit to the admonition and discipline of the constituted authority of the church;" " of which refusal or non-compliance the leading authority acknowledged in the first article of this covenant shall be the proper and constitutional judges." The leading authority, thus referred to, we understand to be the ministers and elders of this society, who are constituted the " primary authority " therein; and not the ministry of the general community composed of the several societies, or the " parental authority " in the first established ministry at New Lebanon.

The plaintiff has been found and declared by this authority to be not in conformity with the principles of the society; and, upon being warned thereof, refused to submit to the admonition. She was excluded for refusing to " conform and subject " herself " to the counsels and directions of the elders; " and, still persisting in and adhering to the objectionable opinions and doctrines, she proposes to try here the question whether they are in reality inconsistent with the established belief of the society. We have no standard by which to try that question. By her agreement it must be submitted solely and exclusively to the ministers and elders, who are, by that instrument, made " the proper and constitutional judges " of her compliance or non-compliance with the conditions of the association.

*Judgments on the verdicts for the defendant.*