Antioch Temple, Inc. & another[1] *vs.* Edith
Hay Parekh & others.[2]

Middlesex.  March 4, 1981. — June 30, 1981.

Present: Hennessey, C.J., Braucher, Liacos, Abrams, & Nolan, JJ.

*Religion.  Jurisdiction,* Ecclesiastical controversy.  *Constitutional Law,*
Freedom of religion.

A Superior Court judge properly exercised jurisdiction over an action
involving a dispute concerning the control and use of church property
by rival factions within the church where the ecclesiastical documents
of both the church and the national organization to which the church
belonged warranted a conclusion that the church was congregational
rather than part of a larger hierarchical system.  [858-864]
In an action involving a dispute concerning the control and use of church
property by rival factions within the church, a conclusion was war-
ranted that the church's board of directors had acted in accordance
with the church by-laws in removing an individual as pastor and in
withdrawing from a national organization to which the church be-
longed.  [864-865]
Discussion of the decision of the United States Supreme Court in *Jones* v.
*Wolf,* 443 U.S. 595 (1979), which held that a court, consistent with
Federal constitutional guaranties, may exercise its jurisdiction in
church property disputes through application of "neutral principles of
law" even when the church is hierarchical in structure and maintains a
tribunal for the resolution of intrachurch controversies.  [865-868]

Civil action commenced in the Superior Court on May
27, 1975.

The case was heard by *Hallisey*, J., on a master's report.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

---

[1] Edward L. Tompkins.

[2] Nalinikant Parekh and Ivory Miles.

*G. Shepard Bingham* for Ivory Miles.

*Daniel F. Cashman* (*Richard G. Pizzano* with him) for the plaintiffs.

HENNESSEY, C.J.   This case involves a dispute over the control and use of church property by rival factions within the church.   In 1975, Antioch Temple, Inc. (Antioch), and Edward L. Tompkins, as pastor and president of Antioch, sought an order in Superior Court to require Edith Hay Parekh and her husband Nalinikant Parekh to reconvey to Antioch real estate at 40-44 Williams Street, Cambridge, that had been transferred to her solely on the understanding that it be held in trust for Antioch.   In 1978, appellant Ivory Miles moved to intervene, claiming that he, not Tompkins, was the true pastor and president of Antioch and thus the proper party to represent Antioch in the action.   The case was referred to a master to make findings of fact and conclusions of law.   During the course of the proceedings before the master, Edith Parekh reconveyed the property in question, and subsequently a judgment of dismissal was entered as to her and her husband.

What began as an action to recover property grew to encompass the disputed issues raised by Miles' motion to intervene and by earlier suits between Miles and Tompkins over who was Antioch's true pastor and president and who had the right to control and use the property standing in Antioch's name.   By agreement, the parties chose to adjudicate these expanded issues in order to avoid further protracted litigation.   The master's report favoring Tompkins was confirmed by a Superior Court judge, who entered a judgment declaring Tompkins to be the duly constituted president and pastor of Antioch and ordering Miles to leave the Williams Street property.   Miles appealed to the Appeals Court.   We transferred the case to this court on our own motion.   We affirm.

The facts as found by the master include the following. Antioch, initially an unincorporated church group, was incorporated in 1962 as a religious organization pursuant to G. L. c. 180, for the purpose of carrying out the tenets of

the apostolic faith.   The corporation enacted by-laws establishing a board of directors as its governing body and granting to the board ("subject to any action at any time taken" by voting members of the congregation) "the entire charge, control and management of the corporation, its property and business."   In 1963, the corporation bought real estate at 40-44 Williams Street in Cambridge and began conducting services at that location.   Tompkins became pastor of Antioch that year, but resigned in mid-1964.   He was reappointed as pastor by the board in May, 1966, at which time Miles was designated assistant pastor.   In August, 1966, Tompkins again resigned, whereupon the board appointed Miles as pastor.   Miles offered to serve without compensation.   Several months later, Miles requested and was granted permission to move with his family into the parish house at the Williams Street property, where he has lived ever since.   At no time has he paid any rent, although he has occasionally made mortgage payments on the property.

During 1966 and for several years earlier, Tompkins and Miles, individually, and Antioch as a church, were members of a national church organization named Pentecostal Churches of the Apostolic Faith Association, Inc. (PCAF). PCAF is a nonprofit organization organized in 1957 under the laws of Michigan for the purpose of promoting the apostolic faith.   The organization coordinates and assists member churches and individual members.   The master found that PCAF had no supervisory powers over its member churches, who need not belong in order to be a church of the apostolic faith; that members could resign from PCAF without obligation; and that PCAF had no ecclesiastical court to adjudicate problems between church members.   The issue of PCAF's authority over Antioch's affairs was discussed at a June 15, 1966, meeting attended by the officers and board of directors of Antioch, the attorney for Antioch (who had organized the corporation), and a Bishop Thomas of PCAF.   The attorney advised those present that, based on Antioch's by-laws and the laws of Massa-

chusetts (and contrary to Bishop Thomas' views), the board, and not PCAF, had the right to hire and remove employees of Antioch, including the pastor.

In March, 1968, the board voted to remove Miles as pastor, following dissension stemming in large part from Miles' conception of the pastor as the "sole ruler" of Antioch, to whom all others were subject and over whom the board had no control.[3] Miles was asked to vacate the Williams Street church and parish house by May 1. In May, the board voted to resign Antioch's membership in PCAF, and sent PCAF a letter to this effect. The board also voted to apply for membership with another national church group, the Pentecostal Assembly of the World, and informed PCAF of this action. Miles refused to accept the board's vote to remove him and continued to occupy the church property. At a meeting of members in April, 1969, once again a motion to remove Miles was passed. In June, the board voted to close down the Antioch offices temporarily, and meetings were convened at the homes of members. In July, on the advice of counsel, the board authorized transfer of the Williams Street property to a straw to protect the property from Miles. On May 17, 1971, and again on May 13, 1976, Tompkins was elected president and pastor of Antioch for five-year terms. While pastor, Tompkins attempted to hold services at the Williams Street church, only to have them disrupted by Miles, his wife, and on occasion followers of Miles, who turned off lights, made noise, and shut off the heat. In order to avoid further disturbances, Tompkins rented quarters elsewhere in Cambridge, where he conducted services and meetings.

Sometime during 1971, Miles and Tompkins, both individual members of PCAF, submitted a dispute to PCAF. Both were present and were heard at a meeting of the board of

---

[3] As Miles testified at the hearings before the master, "I am Antioch Temple." Contributing to the decision to remove Miles were specific instances of discord between the board and Miles over various church expenditures and financial transactions.

bishops held in 1972, which issued a ruling that Miles was to continue to conduct services at Williams Street without interference from Tompkins, and that Tompkins had "agreed to lay no further claims to Antioch Temple." Tompkins refused to recognize this ruling and resigned from PCAF shortly thereafter. The master found that Antioch was not bound by any action taken by PCAF in 1971 and 1972, as it did not submit any dispute to PCAF, nor was it a member at that time.

The master concluded that Miles had never been president of Antioch, that he had been removed as pastor by the board in accordance with the by-laws, and that he had no right to remain in the Williams Street property. He also found that Tompkins was the president and pastor of Antioch under the vote of May 13, 1976, and that the pastor of Antioch is subject to the direction and control of the board of directors of Antioch. No objections to the master's report were filed by Miles. The report was confirmed, and its conclusions were incorporated into the judgment of the Superior Court.

The threshold question we face concerns the propriety of the Superior Court's exercise of jurisdiction over this case. Miles argues that Antioch is part of a hierarchical church organization (PCAF), whose ecclesiastical court has already ruled on the issues here presented, and that consequently the lower court and this court are foreclosed from considering the issues, under principles enunciated in *Wheeler* v. *Roman Catholic Archdiocese*, 378 Mass. 58, cert. denied, 444 U.S. 899 (1979), and *Serbian E. Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696 (1976). Miles therefore urges us to vacate the Superior Court judgment and to order that the case be dismissed.[4] Tompkins, on the other hand, contends that no impediment to civil court jurisdiction exists, because Antioch is a congregational church, free to make its own de-

---

[4] Although it is far from clear whether Miles properly raised the question of jurisdiction below, we proceed on the assumption that the First Amendment bar against judicial intrusion into matters of religious doctrine is the type of jurisdictional issue that cannot be waived.

cisions and to have those decisions judicially enforced. Tompkins contends further that, even if Antioch is deemed part of a larger hierarchical system, exercise of jurisdiction would be appropriate, due to the lack of an ecclesiastical tribunal within that system as contemplated by *Wheeler*, and in light of the United States Supreme Court's approval, in *Jones* v. *Wolf*, 443 U.S. 595 (1979), of the use of "neutral principles of law" in resolving church property disputes.

We have previously acknowledged that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Wheeler, supra* at 63, quoting from *Presbyterian Church* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969) (hereinafter cited as *Blue Hull*). This constitutional restraint guards against the "substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs." *Wheeler, supra,* quoting from *Serbian E. Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 709 (1976). Civil courts are thus forbidden from resolving disputes over church property or administration on the basis of religious doctrine. *Jones* v. *Wolf*, 443 U.S. 595, 602 (1979). *Serbian, supra* at 710. *Maryland & Va. Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc.*, 396 U.S. 367 (1970) (hereinafter cited as *Md. & Va. Eldership*). *Blue Hull, supra* at 449.[5] A court need not stay its hand in every case involving church disputes, however, because "not every civil court decision . . . jeopardizes values protected by the First Amendment." *Id.* Consequently, "a State may adopt any one of various approaches for settling church property disputes so long as it

---

[5] Even before the United States Supreme Court's First Amendment decisions on church disputes, this court had refused to involve itself in controversies requiring interpretation of church doctrine. See, e.g., *Moustakis* v. *Hellenic Orthodox Soc'y*, 261 Mass. 462, 466-467 (1928); *Krauthoff* v. *Attorney Gen.*, 240 Mass. 88, 92 (1921); *Carter* v. *Papineau*, 222 Mass. 464, 467 (1916); *Grosvenor* v. *United Soc'y of Believers*, 118 Mass. 78, 91 (1875).

involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith" (emphasis deleted), *Md. & Va. Eldership, supra* at 368 (Brennan, J., concurring), cited with approval in *Jones* v. *Wolf, supra* at 602.

In determining whether and to what extent civil courts must refrain from involving themselves in controversies concerning religious organizations, both this court and the United States Supreme Court[6] have distinguished between hierarchical and congregational church structures. Although the role of civil courts may differ depending on whether a church is congregational or hierarchical (as discussed below), in either case the courts, in effect, will honor the decision of the governing body chosen by the church members themselves before the dispute arose.

In a congregational structure, the local church congregation is self-governing. *Wheeler, supra* at 62 n.2. "[B]y the nature of its organization, [a congregational church] is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 722 (1871). If a church is deemed congregational, the First Amendment does not bar a civil court from giving effect to an authoritative resolution by the governing church body of a church property or related dispute as long as the governing body followed its own rules in reaching that resolution. See *Md. & Va. Eldership, supra* at 368 (Brennan, J., concurring) (a State may "enforce the property decisions made within a church of congregational polity 'by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government,'" quoting from *Watson* v. *Jones, supra* at 724).[7]

---

[6] But cf. *Jones* v. *Wolf,* 443 U.S. 595 (1979), discussed *infra*.

[7] Cf. *Bouldin* v. *Alexander,* 82 U.S. (15 Wall.) 131, 140 (1872) (holding that the appointed trustees of the property of a congregational church "cannot be removed from their trusteeship by a minority of the church

In a hierarchical church structure, a local church is but an integral and subordinate member of a larger, general church organization. See *Wheeler, supra.* The general church organization typically contains "superior ecclesiastical tribunals with a general and ultimate power of control, more or less complete, in some supreme judicatory over the whole membership of [the] general organization." *Watson* v. *Jones, supra* at 722-723. It is in disputes involving hierarchical churches that civil courts must tread more cautiously, for the First Amendment "permits hierarchical [churches] to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Wheeler, supra* at 61, quoting from *Serbian E. Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 724 (1976). Civil courts must accept as binding "the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization or ecclesiastical rule, custom, or law." *Id.* at 713.[8]

An individual church may combine elements of both hierarchical and congregational polity. For example, a church

---

society or meeting, . . . in direct contravention of the church rules"); *Jones* v. *Wolf,* 443 U.S. 595, 607 (1979) (a State court may adopt the "ordinary presumption that, absent some indication to the contrary, a voluntary religious association is represented by a majority of its members," making this "presumptive rule of majority representation . . . defeasible upon a showing that the identity of the local church is to be determined by some other means").

[8] First Amendment considerations aside, such deference to the hierarchical tribunal is justified by general principles of private ordering. As explained by the United States Supreme Court, "[a]ll who unite themselves to [a general church] do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have [it] reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." *Blue Hull,* 393 U.S. 440, 446 (1969), quoting from *Watson* v. *Jones,* 80 U.S. (13 Wall.) 672, 728-729 (1871). See *Wheeler* v. *Roman Catholic Archdiocese,* 378 Mass. 58, 64 & n.5 (1979).

may be hierarchical in terms of internal administration and discipline, and yet congregational as far as control and use of its property is concerned.[9]

The determination of a church's structure is a question of fact. *Wheeler, supra* at 62 n.2. See *Serbian, supra* at 725 (White, J., concurring). To make this determination and to identify the governing church body, recourse must be had to ecclesiastical documents of the individual church and of any larger church organization with which it is associated.[10] In examining such documents, a court must eschew inquiry into religious doctrine and usage.

In the case at bar, the master made findings of fact concerning the organization of Antioch and PCAF and their relationship to each other. Miles' failure to file any objections to the master's report, as required by Mass. R. Civ. P. 53 (e) (2), 365 Mass. 817 (1974), precludes him from now challenging the factual findings contained in the report.[11] Those findings are binding on appeal unless mutually inconsistent or plainly wrong. *Rose* v. *Homsey,* 347 Mass. 259, 260 (1964). See Mass. R. Civ. P. 53 (e) (2) (in nonjury ac-

---

[9] See *Md. & Va. Eldership,* 249 Md. 650, 663-666, 674 (1967), vacated and remanded, 393 U.S. 528 (1969), on remand, 254 Md. 162 (1969), dismissed for want of a substantial Federal question, 396 U.S. 367 (1970).

[10] Examination of such documents is not, in and of itself, an impermissible intrusion into the religious realm, as suggested by the appellant Miles. Such a proposition could immunize from judicial review actions of religious organizations when those actions are not properly subject to First Amendment protection.

[11] Rule 53 (e) (2) requires the filing of written objections to a master's report in nonjury cases, "clearly stating the grounds for each objection." 365 Mass. 817 (1974). See *Covich* v. *Chambers,* 8 Mass. App. Ct. 740, 746-747 (1979). Rule 53 (e) (2) continues the longstanding requirement, reflected in various old court rules of practice, that a party dissatisfied with a master's findings file objections to the report instead of allowing it to be confirmed, in order to avoid judicial acceptance of the findings as final. See, e.g., *Kolasinski* v. *Paczkowski,* 307 Mass. 73, 76 (1940); *Goodwin* v. *Cosmopolitan Trust Co.,* 248 Mass. 146, 150-151 (1924); *Hillier* v. *Farrell,* 185 Mass. 434 (1904). Had objections based on insufficiency of the evidence been sustained, the Superior Court judge could have chosen to receive further evidence or to recommit the report with instructions. See Mass. R. Civ. P. 53 (e) (2).

tions court is to accept master's factual findings "unless clearly erroneous"). We examine the contents of the confirmed report to determine whether the conclusions reached in the final judgment are "such as the law requires upon the facts found by the master and proper inferences therefrom." *Id.*, quoting from *Foot* v. *Bauman*, 333 Mass. 214, 219 (1955), and cases cited.

The master made no *explicit* finding as to whether Antioch is congregational or hierarchical in structure. Nonetheless, his findings of fact lead us to conclude that Antioch is a congregational church. The master examined the corporate by-laws of Antioch, which set forth the powers of the corporate officers and of the board of directors and which establish procedures for meetings of the board and of the members. Under the by-laws, as noted earlier, the Antioch board of directors is given "the entire charge, control and management of the corporation, its property and business," subject only to action taken by the voting members of Antioch. The board is empowered to "appoint and at its discretion remove and suspend such subordinate officers, agents and employees as it from time to time thinks fit." The master found that this latter provision includes the power to appoint and remove church pastors. He found no indication that, by joining PCAF, Antioch subordinated itself to PCAF in matters of its internal administration and of its control over its own property. Nor did he find anything to prevent Antioch from resigning from PCAF.

Our own examination of the corporate documents of both Antioch and PCAF support these conclusions of the master. By its corporate organization under c. 180, Antioch is not a subdivision of any other entity.[12] The voluntary character of PCAF is affirmed in that organization's own constitution, which states "[a]ny member may resign by filing a written

---

[12] Cf. *Wheeler* v. *Roman Catholic Archdiocese*, 378 Mass. 58, 59-60, cert. denied, 444 U.S. 899 (1979) (local church established as an unincorporated subdivision of the Archdiocese of Boston, which itself is an ecclesiastical entity of the Roman Catholic Church, an episcopal church hierarchical in nature).

resignation with the General Secretary, and such action published in [the] official organ."[13]   Although PCAF appears to have a hierarchical structure,[14] we cannot assume that, by voluntarily affiliating itself with a hierarchical church, Antioch gave up the power to govern itself in matters such as its selection of a pastor and its control and use of its own property.   We recognize that in its articles of incorporation PCAF included as one of its purposes, along with "[t]o promote the Apostolic faith," "[t]o associate, plan, sponsor, conduct, coordinate, supervise, assist, finance, and otherwise direct the spiritual and material well being of Pentecostal Churches of the Apostolic Faith and its ministers, members and associates."   Not only is this language of questionable particularity to warrant a conclusion that Antioch relinquished its autonomy in the particulars relevant to this dispute, but also the master specifically found, based on the evidence before him, that the PCAF "did not have supervisory powers over its member churches."

We conclude, therefore, that Antioch is a congregational church and that the Superior Court judge properly exercised jurisdiction over the dispute at bar.   Given the church's congregational structure, the only question remaining is whether, in acting to remove Miles as pastor and to resign from

---

[13] Appellant Miles contends that the word "member" refers only to individual members, not church members, and that church members may only resign with the approval of the pastor.   We can find no such limitation in the language of the PCAF constitution.   Contrary to Miles' urging, we see no support for his contention in the section on admission to membership, which states that "[a]ny person, or church recommended by Pastor, District Elder or Council affiliated with P.C.A.F. shall be admitted to membership in the corporation."

[14] The constitution of the PCAF places responsibility for the spiritual affairs of the corporation in the Board of Bishops, with secular affairs managed by an executive board of directors subject to the approval of the Board of Bishops.   District elders serve under the bishops.   In his brief, appellant Miles claims that local pastors are appointed by the bishop presiding over a given diocese and perform "immediate supervision and administration of local constituent churches."   Nothing in the PCAF constitution so provides, and Miles has pointed to no relinquishment by Antioch of its administrative autonomy.

PCAF, Antioch followed the by-laws to which its members, including Miles, subjected themselves. See *Md. & Va. Eldership*, 396 U.S. at 368 (Brennan, J., concurring); *Watson* v. *Jones*, 80 U.S. (13 Wall.) at 724-725. Cf. *Mitchell* v. *Albanian Orthodox Diocese in America, Inc.*, 355 Mass. 278, 282-283 (1969); *Canadian Religious Ass'n* v. *Parmenter*, 180 Mass. 415 (1902); *Gray* v. *Christian Soc'y*, 137 Mass. 329, 331-332 (1884) (all looking to by-laws or codes of religious organizations to determine the validity of actions taken at meetings). The master expressly concluded that Antioch's board of directors acted in accordance with Antioch's by-laws in removing Miles as pastor. Although he made no such explicit conclusion with respect to his finding that the board voted to withdraw from PCAF,[15] the validity of this vote is implicit in his report. In any event, Miles did not object to any aspect of the master's findings that Antioch withdrew from PCAF and validly removed Miles as pastor, and we accept those findings as not plainly wrong.[16] We also accept the finding that Tompkins became Antioch's president and pastor pursuant to the board of directors' votes of May 17, 1971, and May 13, 1976. The judgment of the Superior Court, in declaring Tompkins to be the duly constituted president and pastor of Antioch and ordering Miles to leave the Williams Street property, does no more than honor the decisions of the governing body of a congregational church, and must be affirmed.

We observe that even if Antioch were found to be part of a hierarchical church structure, our next inquiry would be

---

[15] Cf. *Md. & Va. Eldership*, 254 Md. 162, 176 (1969), appeal dismissed for want of a substantial Federal question, 396 U.S. 367 (1970) (giving effect to decision of local church corporation, "pursuant to a valid vote of the trustees and members," to separate from parent church organization).

[16] Miles would have us consider an unconfirmed master's report in an earlier case between these parties that was dismissed for lack of prosecution. In that case, the master found both actions of the board invalid because the meetings were called improperly. That report is not part of the record on this appeal. Even if it were, its findings would not control over the findings made by the master below, as an unconfirmed master's report settles nothing. *Malden Trust Co.* v. *George*, 303 Mass. 528, 529 (1939).

whether that hierarchical church "maintains a tribunal for the resolution of controversies of this nature." *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 62 (1979). In *Wheeler*, it was uncontroverted that the Roman Catholic Church maintained such a tribunal, and that members aggrieved by actions of the Archbishop (as were the local parishioners in *Wheeler*) were to seek redress through the established archdiocesan judicial system. *Id.* at 60, 62. Here, however, the master found, again without objection on Miles' part, that "[t]he P.C.A.F. does not have an ecclesiastical court to adjudicate problems between church members or other members of the P.C.A.F. although a dispute between Miles and Tompkins . . . was submitted to the P.C.A.F." In *Wheeler*, we reserved opinion as to "whether, if the hierarchical church had no ecclesiastical tribunal, it would then be appropriate for the civil courts to take jurisdiction." *Wheeler, supra* at 62 n.3. Given the United States Supreme Court's latest pronouncement in this area, *Jones* v. *Wolf*, 443 U.S. 595 (1979) (decided two months after *Wheeler*), the First Amendment poses no bar to the exercise of jurisdiction in such a circumstance. Indeed, *Jones*, contrary to earlier Supreme Court cases, permits the exercise of jurisdiction in church property disputes even when a hierarchical church does maintain a tribunal for the resolution of intrachurch controversies. Under *Jones*, "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute," *id.* at 604, and need not defer to the resolution of an authoritative tribunal of a hierarchical church.[17]

---

[17] The facts in *Jones* v. *Wolf*, 443 U.S. 595 (1979), are strikingly similar to those in the case before us, although *Jones* involved a church of a clearly hierarchical nature. The Vineville Presbyterian Church of Macon, Georgia, organized in 1904 and incorporated in 1915, was established in 1904 as a member church of the Augusta-Macon Presbytery of the Presbyterian Church in the United States (PCUS), which has a hierarchical form of government. *Id.* at 597-598. Under the polity of the PCUS, the government of the local church is committed to that church in the first instance, subject to review and control of higher church courts. *Id.* at 598. In 1973, at a meeting attended by a quorum of its members, the members

The "neutral principles of law" analysis expressly approved in *Jones*[18] would lead to precisely the same result as that reached by the more well-established approach already followed in this opinion. Under the "neutral principles of law" analysis, as long as a State court's resolution of a church property dispute involves no inquiry into religious doctrine, the court may examine such sources as (a) statutory provisions governing the holding of property by religious corporations; (b) the constitutions and by-laws of the religious organizations involved, especially in so far as they pertain to the ownership and control of church property; and (c) the deeds to the property in question. See, e.g., *Jones v. Wolf, supra* at 599-601; *Md. & Va. Eldership, supra.* Even if the highest tribunal of a hierarchical church has ruled on the property dispute, the civil courts, as a matter of Federal constitutional law, need only "defer to the resolution of issues of religious doctrine or polity" by that tribunal. *Jones v. Wolf, supra* at 602.

Applying this analysis to the case at bar, we note that the statutory provisions applicable to all religious corporations, without regard to doctrine, allow Antioch to hold and con-

of the Vineville Church voted 164/94 to separate from the PCUS, and so informed the PCUS. An investigatory commission appointed by the PCUS eventually issued a ruling declaring that the minority faction constituted the true church congregation. The minority sued for declaratory and injunctive relief, to establish their right to exclusive possession and use of the local church property as a member of PCUS. *Id.* at 598-599. The Georgia courts examined the deeds of the local church, its corporate charter, and the PCUS constitution, and concluded that legal title to the property was in the local church, and that the PCUS had no interest in the property. *Id.* at 601. The Supreme Court approved this approach. (The Court remanded on the uncertain question whether, under Georgia law, the identity of the local church was to be determined according to majority rule or according to PCUS laws and regulations set out in its Book of Church Order; in the latter event, the Georgia courts would have to defer to the decision of the PCUS commission, as questions of religious doctrine and polity would be involved. *Id.* at 607-609.)

[18] The "neutral principles of law" approach was first mentioned with approval in earlier Supreme Court opinions authored by Justice Brennan, who joined the *Jones* majority. *Blue Hull*, 393 U.S. 440, 449 (1969). *Md. & Va. Eldership*, 396 U.S. 367, 368-370 (1970) (concurring opinion).

vey real estate, as long as the property held is devoted to the religious purposes set forth in the articles of organization. See G. L. c. 180, § 6. As already noted, Antioch's by-laws give its board of directors control over its own corporate property, subject only to action by the voting members. See G. L. c. 180, § 6; c. 156B, § 9 (d). An examination of the articles of incorporation of PCAF reveals merely that PCAF is authorized to buy and hold real estate; there is no provision for loss of property held by a member church that withdraws from PCAF. The deeds to the Williams Street property are not part of the record, but it is not contested that under them legal title to the property is in Antioch Temple, Inc.; there is no suggestion that they provide for a reverter to PCAF in the event of Antioch's withdrawal from that organization. Given these facts, even were we to hold that Antioch is part of a hierarchical church whose highest tribunal ruled on the dispute (by granting Miles the control and use of the Williams Street property), the First Amendment would not command us to accept that ruling.

As the long-established judicial approach applicable to controversies within congregational churches suffices to affirm the judgment of the Superior Court in this case, we need not decide today whether, as a matter of policy, it would be preferable to adopt the "neutral principles of law" approach for resolution of church property disputes in all cases.

The judgment of the Superior Court is affirmed. There having been no argument or hearing on the plaintiffs' motions for damages, the motions are denied without prejudice.

*So ordered.*