Primate & Bishops' Synod *v.* Russian Orthodox Church.

THE PRIMATE AND BISHOPS' SYNOD OF THE RUSSIAN
ORTHODOX CHURCH OUTSIDE RUSSIA *vs.*
THE RUSSIAN ORTHODOX CHURCH OF THE HOLY
RESURRECTION, INC., & others.[1]

No. 92-P-392.

Worcester. April 14, 1993. - August 23, 1993.

Present: DREBEN, KAPLAN, & PORADA, JJ

Further appellate review granted, 416 Mass. 1109 (1993).

*Religion. Jurisdiction*, Ecclesiastical controversy. *Constitutional Law*, Freedom of religion.

Discussion of the distinctions in categories of church government to be considered in cases involving an intrachurch argument over church property. [195-197]

The record of an action brought by church authorities seeking a declaration that the real and personal property of a certain parish was subject to the church's control supported the judge's finding that the parish was congregational in terms of the ownership and management of its property and was not subject to the church's control. [197-200]

Members of an incorporated church parish validly within their authority amended the articles of organization and by-laws of the corporation; the amended by-laws became effective no later than the time when the amendment to the articles of organization were filed with the State Secretary. [200-202]

The record of a declaratory proceeding did not support the contention of the plaintiff, a church seeking to gain control of a parish's property, that the parish's property was held in trust for the church. [202-203]

CIVIL ACTION commenced in the Superior Court Department on December 30, 1987.

The case was heard by *James P. Donohue*, J.

*John O. Mirick* for the plaintiff.

---

[1]Victor Melehov, rector, Peter Farnsworth, deacon, and Gregory Melehov, Nina Marcinowski, Lydia Boyko, Peter Chaplain, Elizabeth Chisholm, Alexandra Logozinska, and Halena Michajlow, members of the parish council of the named defendant corporation.

*Charles B. Swartwood, III,* for the defendants.

DREBEN, J. As a result of differences between members of the parish (Russian Orthodox Church of the Holy Resurrection, Inc.)[2] and the Russian Orthodox Church Outside Russia (Church), the members held an extraordinary parish meeting and voted to amend their articles of organization and by-laws so as to remove all references to the Church in their by-laws. Subsequently, the parish became affiliated with another orthodox umbrella organization. The executive board (Synod) of the Church brought this action seeking a declaration that the vote at the extraordinary parish meeting was illegal and that the real and personal property of the parish is subject to the dominion and control of the Church.

After determining that the parish "was hierarchical in terms of internal administration, discipline and matters of faith," but "congregational as far as the control and use of its property," a judge of the Superior Court entered a judgment declaring that the vote at the extraordinary parish meeting was valid, and that the parish was the sole owner of all its assets. The Church has appealed, claiming that the finding that the parish is congregational as to the ownership and control of its property is clearly erroneous and, also, that the judge erred in ruling that the articles of organization and by-laws of the parish were validly amended. We affirm the judgment.

1. *Evidence warranted a finding that the parish is congregational as to ownership of property.* Before discussing the evidence supporting the judge's finding, we explain its significance. The traditional judicial approach in a case involving an intrachurch argument over church property is to determine where, within the religious association, the church members, prior to the schism, have placed the ultimate authority over the use of church property. *Jones* v. *Wolf,* 443 U.S. 595, 618-619 (1979) (Powell, J., dissenting). *Antioch Temple, Inc.* v. *Parekh,* 383 Mass. 854, 860 (1981). As put by Justice Powell in *Jones, supra* at 619: "The courts, in an-

---

[2] A Massachusetts corporation located in Worcester.

swering this question have recognized two broad categories of church government. One is congregational, in which authority over questions of church doctrine, practice, and administration rests entirely in the local congregation or some body within it. In disputes over the control and use of the property of such a church, the civil courts enforce the authoritative resolution of the controversy within the local church itself [citation omitted]. The second is hierarchical, in which the local church is but an integral and subordinate part of a larger church and is under the authority of the general church."

Recognizing this distinction, the Supreme Judicial Court has explained that "in disputes involving hierarchical churches [the] civil courts must tread more cautiously, for the First Amendment 'permits hierarchical [churches] to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters' [citations omitted]. Civil courts must accept as binding 'the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization or ecclesiastical rule, custom, or law.' " *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. at 861, quoting from *Serbian E. Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 724, 713 (1976).[3]

A church may, however, be hierarchical in some matters and congregational in others. "For example, [and this is what the Superior Court judge in the present case found as to the Church] a church may be hierarchical in terms of internal administration and discipline, and yet congregational as far

---

[3]There is also another judicial approach, the "neutral principles of law" analysis expressed in *Jones* v. *Wolf*, 443 U.S. 595, 602-604 (1979). As explained in *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. at 867, that approach requires civil courts, even if the highest tribunal of a hierarchical church has ruled on a property dispute, to defer to that tribunal only on "the resolution of issues of religious doctrine or polity." In the case at bar, under this "neutral" analysis, we would reach the same result as we reach under the traditional principles for substantially the same reasons as expressed in *Antioch*, *supra* at 867-868.

as control and use of its property is concerned." *Antioch,*
*supra* at 861-862.

Since the "determination of a church's structure is a ques-
tion of fact," *Id.* at 862, citing *Wheeler* v. *Roman Catholic*
*Archdiocese of Boston,* 378 Mass 58, 62 n.2, cert. denied,
444 U.S. 899 (1979), we turn to the evidence before the Su-
perior Court judge to review the Church's claim that his
finding was clearly erroneous.

Part of the analysis, of course, depends on the "ecclesiasti-
cal documents of the individual church and of any larger
church organization with which it is associated." *Antioch,*
*supra* at 862. The Church maintains that its "Regulations"
and the parish by-laws give the Church the right to control
parish and Church property.

When looked at alone, apart from the testimony at trial,
the Church documents provide considerable force to the
Church's position. Thus, among the matters coming within
the jurisdiction of the Synod, according to the Regulations of
the Church, are "[m]atters concerning church property in di-
oceses [and] parishes . . . coming within the jurisdiction of
[the] Synod." Another Regulation states that the

> "diocesan bishop, having the overall care of his diocese
> and its prosperity . . . [among other matters] adminis-
> ters and disposes of diocesan and monastic property and
> supervises all other church property in the diocese, in
> accordance with the 41st Apostolic canon: 'We com-
> mand that the Bishop have authority over the property
> of the church'. . . ."

The parish by-laws also lend support to the Church's con-
tention that the Church had control over the parish's prop-
erty. At the time of the parish's organization, it adopted the
"normal" by-laws of the Church. While providing that the
management of church and parish property is vested in the
parish council, the "sale of church real estate, its alienation,
exchange or cession for building purposes, shall be effected
subject to the authorization of the . . . Synod." Parish prop-
erty of every kind, on the other hand, may be sold, leased

and ceded for building purposes by decision of the parish. Closing of the parish must be voted by two-thirds of its members, and upon closing, "the entire personal and real estate of the parish shall be turned over to the direct management and disposition of the diocesan authorities . . . ."

In assessing the judge's findings, the documents are but part of the evidence. When the testimony at trial is considered, the judge's finding that the parish is congregational in terms of the ownership and management of its property and is not subject to the Church in such matters is not clearly erroneous. The parish, as the judge found, was always a separate legal entity and not a subdivision of any other entity. It had paid for the real estate and its other property with its own funds and always had held title in its own name. The property was never "diocesan, monastic or Church property."

The prerevolutionary manner of ownership of property by parishes of the Russian Orthodox Church, as well as the pattern of ownership of property of parishes affiliated with the Church after its founding in 1921, also provides support for the judge's finding. The testimony as to the history of the Russian Orthodox Church before the 1918 Revolution explained that the apostolic canons, of which the forty-first is a part, were adopted in the Third and Fourth Centuries, and that in the Russian Orthodox Church, the patterns of ownership of property varied over time and reflected local conditions. While the only person who could appoint a priest was the bishop, property and indeed churches belonged to various groups, including tradesmen, nobles, and the Tsars. The bishops owned their own cathedrals and some private property and often created their own small churches. An expert in Russian theological studies at the College of the Holy Cross described the pattern as "something not unlike the crazy quilt of ownership" in the Roman Catholic Church prior to the establishment of the rigid canons of church ownership whereby the Catholic bishops took title. There was both a hierarchical system of jurisdiction and a vastly different, "al-

most more like a congregational notion of ownership of property side by side."[4]

After the Russian Revolution, the Russian Orthodox Church Outside Russia (Church) was established in Constantinople in 1921. The headquarters later moved to Serbia and, after the second world war, to New York City. The Orthodox Church in America, with which the parish subsequently became affiliated, was originally part of the Church, but is now a separate entity. There has been much voluntary movement of parishes in and out of the Church, as well as in and out of the other Orthodox umbrella organizations.

At the time the parish left the Church in 1987, about twenty other parishes also left.[5] Among them was a Toronto parish which had joined the Church after having previously left the Greek Orthodox Archdiocese of North and South America. During the time the Toronto parish was affiliated with the Church, it had accumulated land and buildings having a value of over four million dollars. When the parish left, the Church made no claim to such property. Although the Toronto parish apparently had different by-laws and a different arrangement with the Church (what the arrangement entailed was not in evidence), other of the twenty parishes that left the Church had the "normal" Church by-laws,[6] yet the

---

[4]Unlike the Roman Catholic Church, there was evidence that in the Russian Orthodox Church authority is vested in the whole body of the laity as well as in the hierarchy; it was described as "an organic, as opposed to a juridical notion of authority." There was also testimony that there were congregational aspects in the orthodox faith; in theory the bishop is elected by the people as well as the clergy, and that even in appointing the priest, the bishops would not impose someone upon the parish whom the parish did not want.

[5]The reason for the exodus was that these parishes considered it a breach of faith and contrary to the Regulations for the Church to make contact with the Soviet Church. The Regulations state that the basic task of the Church "is the preservation abroad of complete independence of the Russian Orthodox Church from atheistic and anti-Christian forces and the overall spiritual nourishment of the Orthodox Russian flock in the diaspora, independent of nationality."

[6]The Church, in its brief, claims that parishes were required to adopt the "normal" by-laws. There is no support in the evidence for this claim, and it appears that a number of parishes had different by-laws.

Worcester parish and a parish in Ipswich were the only ones whose property was demanded by the Church.

On the basis of the foregoing evidence, particularly of the considerable movement in and out of the Church by individual parishes who took with them their own property without claim by the Church, the judge's finding that the parish was congregational as far as the control and use of its property was concerned was not clearly erroneous.

2. *Validity of amendments to the articles of organization and by-laws.* The Church proffers several arguments to challenge the validity of the amendments to the articles of organization and the by-laws voted by the parish at the extraordinary meeting of the members held on January 4, 1987: (a) that there was neither a two-thirds vote nor compliance with the requirements that amendments are "subject to the approval of the Diocesan Bishop" and are conditional on "ratification by the Bishops' Synod"; (b) that since the articles of amendment were not filed until January 15, 1987, the by-laws could not be validly amended prior to that date and hence the January 4 amendments to the by-laws were invalid; (c) that since, as found by the trial court, the parish is hierarchical in terms of internal administration, discipline, and matters of faith, the parish's property is held in trust for the Church. The trial court properly rejected these arguments.

a. The articles of organization establish the purposes and governance of a corporation, see 1A Fletcher, Cyclopedia of Private Corporations § 164 (rev. ed. 1993), and where by-laws are in conflict with the articles, the by-laws being subordinate, the articles of organization control. G. L. c. 156B, § 16, made applicable by G. L. c. 180, § 6A. Cf. *Assessors of Boston* v. *World Wide Bdcst. Foundation of Mass., Inc.*, 317 Mass 598, 604 (1945). The parish's original articles of organization gave no rights to the Synod, and under G. L. c. 180, § 7, the members were authorized to make any amendment (with certain qualifications not here applicable) which they could have included in the original articles. Nothing precluded the 1987 amendment which pro-

vided "that the [b]y-laws of the corporation may be amended by a two-thirds vote of the members of the corporation without the consent or approval of any other person." Not only was the amendment authorized, but the original by-law requiring approval by nonmembers of the corporation was, itself, of questionable validity. See *Greek Orthodox Community* v. *Malicourtis*, 267 Mass 472, 483 (1929).[7]

Under the by-laws (both original and as amended), parish members who have failed for twelve months to pay their membership dues are excluded from parish membership. The Church's claim that the vote lacked a two-thirds majority because two members were entitled, but not permitted, to vote is without merit as there was evidence that those two members had not paid dues for twelve months.

b. We also reject the Church's argument based on *Guterman* v. *Rice*, 121 F. 2d 251, 253-254 (1st Cir.), cert. denied, 314 U.S. 680 (1941), that the vote to amend the by-laws was ineffective because the vote was taken prior to the effective date of the amendment to the articles of organization.[8] In *Guterman*, the issue was whether a chattel mortgage was properly recorded, a question which depended on the residency of the domestic corporation for purposes of the chattel mortgage recording act. Since there was no showing that the corporation had complied with the statutory requirement that its articles of association be amended to reflect its new residence or that such an amendment had been certified or

---

[7]Speaking of a regulation which required approval of a spiritual leader (metropolitan) in all matters concerning the management of the community, the court in that case said:

> "Such a regulation, putting it out of the power of the corporation to amend its constitution except with the approval of Metropolitan Komvopoulos, is 'unreasonable and inconsistent with the legal right of control of the affairs of the corporation existing in its membership,' and in such form it is 'utterly subversive of the right of control of a corporation which belongs to its members.' *Saltman* v. *Nesson*, [201 Mass. 534, 542 (1909)]."

[8]The amendment was filed on January 15, 1987, eleven days after the vote. There is no statutory provision making such filing untimely. See G. L. c. 156B, §§ 72, & 6, made applicable by G. L. c. 180, § 7. Section 72 provides that the amendment takes effect when filed.

recorded, the court held that a change in legal residency enacted in its by-laws was not effective. It considered the filing requirements to have been enacted for the benefit of creditors. Unlike the *Guterman* case where it was not shown that the article of association had been amended, let alone filed, the amendment of the articles in the case at bar was both voted and filed; moreover, it in no way affected the rights of any creditors or any member of the public, except the Church, which knew full well the nature of the votes.

Of significance in our decision that the amendment to the by-laws was valid is the analogous situation when a corporation is first organized. See G. L. c. 156B, § 12. That section also provides that original articles of organization only become effective when filed. Yet the section requires the adoption of by-laws and does not suggest that the by-laws must await the filing of the articles of organization with the State Secretary. The implication is to the contrary. Where the rights of creditors or other reliance interests are not involved, we see no reason to hold that a by-law is invalid solely because it was adopted simultaneously with an amendment to the articles of organization. The amended by-laws became effective no later than the time when the amendment to the articles of organization was filed.

c. The last argument of the Church, namely that a trust was created, is refuted by the evidence. The original articles of organization did not mention the Church,[9] and there was testimony that there were other umbrella organizations for Russian Orthodox parishes outside Russia, other than the Church. Indeed, other than the commemoration of a different bishop (spiritual leader), the testimony was that the services of the parish were maintained in "the exact same manner" after the parish left the Church. Neither the documents nor the testimony suggests that a trust was created. See

---

[9]The original articles listed the following purposes: "To unite the faithful around the parish church according to the teachings, canons, customs and rules of the Russian Orthodox Church, in order to satisfy the religious needs of the members of the parish and to uplift their spiritual and moral level."

*Greek Orthodox Community* v. *Malicourtis*, 267 Mass at 480-481; *St. Michael's Ukrainian Greek Catholic Church of Woonsocket, R.I.* v. *St. Michael's Ukrainian Orthodox Church of Woonsocket, R.I.*, 288 Mass. 258, 261-262 (1934).

*Judgment affirmed.*