Flannery, J.
Plaintiffs Elizabeth Weaver, Roy Varner, and Members for the Manual, Inc. commenced the instant action against the present and former officers of the First Church of Christ, Scientist, in Boston. In their complaint, the plaintiffs allege that the defendants engaged in ultra vires conduct by making cer *523 tain expenditures on media ventures. The plaintiffs seek declaratory and injunctive relief as well as an accounting of those expenditures. The defendants now move to dismiss the complaint on the grounds that, pursuant to Mass.R.Civ.P. 12(b)(1), this court lacks subject matter jurisdiction to hear the dispute.[2] Additionally, the defendants contend that the plaintiffs lack standing to challenge the defendants’ conduct in the management of their church. For the reasons stated below, the defendants’ motion to dismiss is allowed in part and denied in part.
BACKGROUND
The complaint alleges the following. In 1879, the Church of Christ, Scientist was formed. Pl. Compl. para. 12. After the execution of a Deed of Trust by Mary Baker Eddy in 1892, which conveyed certain land in Boston in trust for the benefit of the church (the 1892 Deed), the church reorganized as The First Church of Christ, Scientist (“The Mother Church”). Id. In the years that followed, Mary Baker Eddy promulgated by-laws and executed various Deeds of Trust which provided for the governance of The Mother Church. Pl. Compl. para. 13. The by-laws and two of the deeds are published in the Mother Church’s constitution, Manual of the Mother Church, The First Church of Christ, Scientist, in Boston, Massachusetts (the “Manual"). Id. Pursuant to the Manual, the business of the Mother Church is conducted by a five-person Board of Directors. Pl. Compl. para. 14. According to Mrs. Eddy, however, the government of the Christian Science denomination is “(e)ssentially democratic, its government is administered by the common consent of the governed, wherein and whereby man governed by his creator is self-governed.” Pl. Compl. para. 4, citing The First Church of Christ, Scientist, and Miscellany, 247:2 and 254:24.
Mrs. Eddy also established the Christian Science Publishing Society by Deed of Trust dated January 25, 1898 (the “1898 Deed”). Pl. Compl. para. 16.[3] The 1898 Deed and the Manual established a three-person Publishing Society Board of Trustees “whose function is to superintend the Publishing Society property and to conduct the publishing activities of The Mother Church.” Pl. Compl. para. 17. Pursuant to the 1898 Deed, the Trustees may not invest revenues of the Publishing Society “for the purpose of speculation” or incur “liability beyond their ability to liquidate promptly from the current income of business." Pl. Compl. para. 30. Furthermore, the Manual provides that any vacancies on the Board of Trustees are to be filled by the remaining Trustees of the Publishing Society. Pl. Compl. para. 17.
The individual plaintiffs are members of the Mother Church in good standing. Pl. Compl. para. 24. In their complaint, the individual plaintiffs assert that their status as beneficiaries of The Mother Church and of the various wills, trusts, and bequests established by Mrs. Eddy and others to fund and maintain The Mother Church gives them a distinct interest in the governance and financial affairs of the Mother Church apart from the interest of the public generally. Pl. Compl. para. 24, 25.
The plaintiff, Members for the Manual, Inc., is a Massachusetts corporation comprised of members of The First Church of Christ, Scientist, in Boston, in good standing. Pl. Compl. para. 4. Organized and operated exclusively for charitable, educational, and religious purposes, including the promotion of knowledge and understanding of the Christian Science religion as established by Mary Baker Eddy, the corporation seeks to encourage adherence to the rules and by-laws set forth in the Manual and to prevent and seek restitution for waste, fraud, negligence, abuse of trust or any other improper, unlawful or unauthorized acts in the governance of The Mother Church. Id.
At all significant times pertinent to this controversy, the defendants were or are now officers of the Board of Directors or officers of the Publishing Society of the First Church of Christ, Scientist, in Boston.
The substance of the plaintiffs’ Complaint is that during the middle and late 1980s, the defendants[4] caused The Mother Church and the Publishing Society to invest in a series of speculative ventures in magazine publication,[5] radio,[6] and television.[7] Pl. Compl. para. 35. The plaintiffs allege that these reckless expenditures of millions of dollars by the defendants exhausted The Mother Church’s unrestricted fund (the fund available for general Church purposes) and has left the Church effectively insolvent. Pl. Compl. para. 88.[8] The plaintiffs further allege that the defendants improperly transferred and borrowed monies from the Church Pension Plan to fund their speculative media ventures. Pl. Compl. para. 76-77.[9] In doing so, the plaintiffs allege that the defendants engaged in ultra vires conduct in contravention of the Manual.
Specifically, the plaintiffs allege that the defendants failed to abide by the checks and balances established in the Manual. The by-laws provide for the Finance Committee to oversee the finances and expenditures of The Mother Church and the Board of Directors, with authority to remove Directors. Pl. Compl. para. 26. The plaintiffs contend that the waste of The Mother Church’s assets was accomplished by defendants’ disregard of the Finance Committee’s powers as delineated in the Manual Pl. Compl. para. 96. For instance, the plaintiffs aver that the Board of Directors promulgated a policy which destroyed the Finance Committee’s ability to properly discharge its oversight responsibilities thereby violating the Manual’s requirement that the Committee unanimously approve all expenditures. Pl. Compl. para. 96(a). The Manual also provides that any vacancies on the Publishing Society Board of Trustees are to be filled by the remaining Trustees of the Publishing Society. Nevertheless, the plaintiffs allege that Board of Directors has controlled the Publishing Society by filling vacancies. Pl. Compl. *524 para. 17. As a result of the defendants’ actions and inactions, the plaintiffs claim that the defendants have and continue to breach the Manual and the 1898 Deed, leaving The Mother Church and its Pension Plan effectively insolvent. Pl. Compl. para. 98.
The plaintiffs fashion their complaint into four counts. In Count I, the plaintiffs allege that the defendants’ restriction on the Finance Committee’s powers is ultra vires conduct in violation of the Manual, Art. XXIV, Sec. 4, and has resulted in the defendants’ ability to expend The Mother Church’s resources on speculative, unsound media ventures and to improperly transfer funds. Pl. Compl. para. 100-02.
In count II, the plaintiffs allege that the defendants, “(i]n authorizing or failing to prevent the excessive, unreasonable and wasteful spending on media ventures,” have engaged in ultra vires conduct in violation of Art. XXIV Sec. 5 of the Manual, which provides that “God requires wisdom, economy, and brotherly love to characterize all the proceedings of the members of The Mother Church, The First Church of Christ, Scientist.” Pl. Compl. para. 103-05.
Next, the plaintiffs allege that under the 1898 Deed, the defendant Trustees of the Publishing Society were prohibited from investing the revenues of the society for speculative purposes and from incurring liability beyond their ability to liquidate promptly from current income. Pl. Compl. para. 107. By investing in the various media ventures delineated above, the plaintiffs contend, the defendants have engaged in ultra vires conduct in violation of the 1898 Deed of Trust (Count III). Pl. Compl. para. 107-08.
Finally, the plaintiffs seek an “accounting of the expenditures made and authorized by any of the defendants in connection with media ventures and massive transfer of funds” from the Pension Plan (Count IV). Pl. Compl. para. 110.[10]
The defendants now move for dismissal contending that, pursuant to Mass.R.Civ.P. 12(b)(1), the First Amendment precludes this court from adjudicating the present dispute, and that the plaintiffs lack standing to obtain the relief sought. The plaintiffs oppose the motion, contending that under the neutral principles of law approach this court may entertain the present dispute. Moreover, the plaintiffs claim that their status as members of The Mother Church is sufficient to confer standing.
DISCUSSION
In evaluating the sufficiency of a complaint, the court must take the allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiffs favor, as true. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991), and cases cited. A complaint is not subject to dismissal if it can support relief under any theory of law. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979). A motion to dismiss is not an appropriate vehicle for deciding undecided points of substantive law. M. Ascheim Co., Inc. v. Turkanis, 17 Mass.App.Ct. 968 (1983), citing Jenkins v. Jenkins, 15 Mass.App.Ct. 934 (1983).
A. Jurisdiction
The First Amendment, made applicable to the States by the Fourteenth Amendment, provides that “Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof ...” U.S. Const. amend. I. It is axiomatic that “the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization.” Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 785, cert. denied, 114 S.Ct. 2164 (1994), citing Alberts v. Devine, 395 Mass. 59, 72 (1985), and cases cited.[11] Thus, consistent with the First Amendment, courts cannot entertain litigation where the issue is “strictly and purely ecclesiastical in character, concerns theological controversy and church government alone, and has no relation to property rights or personal injuries.” Moustakis v. Hellenic Orthodox Society of Salem and Peabody, 261 Mass. 462, 467 (1928); accord Mitchell v. Albanian Orthodox Diocese in America, Inc., 355 Mass. 278, 282 (1969) (discussing policy of judicial nonintervention in exclusively or primarily ecclesiastical disputes).
While “First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice,” merely because a dispute involves a religious organization does not necessarily mean that civil court resolution will jeopardize these values. Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969); see also Madsen v. Erwin, 395 Mass. 715, 722 n.2 (1985) (not every endeavor affiliated, however tenuously, with a recognized religious body qualifies as a religious activity within the protection from governmental involvement afforded by the First Amendment); Feldstein v. Christian Science Monitor, 555 F.Supp. 974, 978 (D.Mass. 1983) (“not every enterprise cloaking itself in the name of religion can claim the Constitutional protection conferred by that status”). Civil courts may permissibly decide church property disputes “so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.” Jones v. Wolf, 443 U.S. 595, 602 (1979). See, e.g., Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 785-86 (role of civil courts in resolving church property disputes limited by First Amendment), cert. denied, 114 S.Ct. 2164 (1994); Wheeler v. Roman Catholic Archdiocese of Boston, 378 Mass. 58, 63, cert. denied, 444 U.S. 899 (1979); Gorodetzer v. Kraft, 360 Mass. 743, 745 (1972). Accord Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 709, reh’g denied, 429 *525 U.S. 873 (1976); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969). Likewise, judicial intervention is permissible where the dispute involves the interpretation of by-laws as they constitute a contract between the church and its members. E.g. Lopez v. Medford Community Center, Inc., 384 Mass. 163, 168 (1981); Jessie v. Boynton, 372 Mass. 293, 303 (1977); Mitchell v. Albanian Orthodox Diocese in America, Inc., 355 Mass. 278, 282 (1969).
In determining whether jurisdiction is appropriate, the Supreme Judicial Court has focused either on the structure of the church or on whether neutral principles of law can be applied to resolve the dispute. Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 787-88, cert. denied, 114 S.Ct. 2164 (1994); Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 867 (1981). A congregational church is one in which the local congregation is self-governing, where “authority over questions of church doctrine, practice, and administration rests entirely in the local congregation or some body within it.” Primate and Bishops’ Synod of the Russian Orthodox Church v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass.App.Ct. 194, 196 (1993), aff'd, 418 Mass. 1001 (1994); accord Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 860 (1981). The First Amendment does not preclude civil courts from enforcing congregational churches’ authoritative resolution of a controversy. Primate and Bishops’ Synod of the Russian Orthodox Church v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass.App.Ct. 194, 196 (1993), aff'd, 418 Mass. 1001 (1994); Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 860 (1981).
A hierarchical church is one that is “an integral and subordinate member of a larger, general church organization.” Antioch Temple, Inc. v. Parekh 383 Mass. at 861; accord Primate and Bishops’ Synod of the Russian Orthodox Church v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass.App.Ct. 194, 196 (1993), aff'd, 418 Mass. 1001 (1994). “(I]n disputes involving hierarchical churches [the] civil courts must tread more cautiously, for the First Amendment permits hierarchical [churches] to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters . . . Civil courts must accept as binding the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization or ecclesiastical rule, custom, or law.” Primate and Bishops’ Synod of the Russian Orthodox Church v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass.App.Ct. 194, 196 (1993), aff'd, 418 Mass. 1001 (1994) (internal quotations and citations omitted). Accord Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 724-25, reh’g denied 429 U.S. 873 (1976); Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church, 344 U.S. 94, 110 (1952) (describing hierarchical churches); Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 861 (1981); Wheeler v. Roman Catholic Archdiocese of Boston, 378 Mass. 58, 61 (First and Fourteenth Amendments permit hierarchical religious organizations to establish own rules for internal discipline and government), cert. denied, 444 U.S. 899 (1979).
A church may be hierarchical in certain respects, but congregational in others. Primate and Bishops’ Synod of the Russian Orthodox Church v. Russian Orthodox Church of the Holy Resurrection, Inc., 418 Mass. 1001-02 (1994). The determination of a church’s structure is a question of fact. E.g. Primate and Bishops’ Synod of the Russian Orthodox Church v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass.App.Ct. 194, 197 (1993), aff'd, 418 Mass. 1001 (1994); Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 862 (1981). Such a determination often requires inquiry into church documents. Antioch Temple, Inc. v. Parekh, 383 Mass. at 862.[12]
In the case at bar, the plaintiffs have alleged that The Mother Church’s government “is essentially democratic.” While the defendants assert that theirs is a hierarchical church, the court must take the allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiffs favor, as true. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991), and cases cited. Moreover, even where a hierarchical church is involved, judicial intervention is not precluded unless the church maintains an internal system of tribunals for the resolution of the dispute. Wheeler v. Roman Catholic Archdiocese of Boston, 378 Mass. 58, 62, cert. denied, 444 U.S. 899 (1979). Accordingly, a determination of the church’s structure and this court’s jurisdiction necessarily involves a consideration of the relevant church documents. Such a determination is not appropriate on a motion to dismiss.
Under the neutral principles of law approach, moreover, courts may, consistent with the First Amendment, resolve property disputes by relying exclusively on objective, well-established principles of trust and property law, as under such an approach courts are completely free from entanglement in questions of religious doctrine, polity, and practice. Jones v. Wolf, 443 U.S. 595. 602 (1979). Accordingly, courts may examine religious doctrines such as a church constitution, but “must take special care to scrutinize the document in purely secular terms.” Id. at 604. Where a deed, charter, etc. employs religious concepts, courts must defer to the authoritative ecclesiastical body for a resolution of doctrinal issues. Id. Where a dispute may be resolved without inquiry into religious doctrine or polity, a court may examine such sources as “ ‘(a) statutory provisions governing the holding of property by religious corporations; (b) the constitution and by-laws of religious organizations involved, especially *526 in so far as they pertain to the ownership and control of church property: and (c) the deeds to the property in question’ to resolve the dispute.” Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 786 (1994), cert. denied, 114 S.Ct. 2164 (1994), quoting Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 867 (1981). See also Eustace v. Dickey, 240 Mass. 55 (1921) (finding that directors had power under the terms of the trust to remove the trustee, court held that it could not substitute its judgment for the board).
In the instant case, the plaintiffs allege that in dealing with church property, the defendants engaged in ultra vires conduct in contravention of the church by-laws. Specifically, count I of the plaintiffs’ complaint asserts that the defendants breached Art XXIV, Sec. 4 of the Manual, which provides: “Prior to paying bills against the Church, the Treasurer . . . shall submit them all to said committee [on finance] for examination. This committee shall decide thereupon by a unanimous vote, and its endorsement of the bills shall render them payable.” The Manual purports to contain the frame of government of the First Church of Christ, Scientist. Accord Dittemore v. Dickey, 249 Mass. 95, 108 (1924). This by-law does not contain any reference to religious doctrine, polity, and practice. Therefore, the court may inquire as to whether “there has been compliance with the essential formalities prescribed by the rules . . . and whether the decision is within the scope of the jurisdiction.” Dittemore v. Dickey, 249 Mass. 95, 108-09 (1924). Since neutral principles of law may be applied to resolve the claim, this court may take jurisdiction. See Jones v. Wolf, 443 U.S. 595, 602 (1979); Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 787-88, cert. denied, 114 S.Ct. 2164 (1994). Accordingly, the defendants’ motion to dismiss count I is denied.
Count II, however, alleges that the defendants failed to abide by the by-law requiring “wisdom, economy, and brotherly love to characterize all proceedings of the members of The Mother Church.” Manual, Art. XXIV, §5. Judicial inquiry into this realm is precluded as it necessarily involves religious concepts. See Jones v. Wolf, 443 U.S. at 602 (where deed, charter, etc. employs religious concepts, courts must defer to the authoritative ecclesiastical body for a resolution of doctrinal issues): Mitchell v. Albanian Orthodox Diocese in America, Inc., 355 Mass. 278, 282 (1969) (discussing policy of judicial nonintervention in exclusively or primarily ecclesiastical disputes); Chase v. Dickey, 212 Mass. 555, 568 (1912) (court refused to resolve controversy concerning use of a gift to the Christian Science Church, finding language of the will which limited the gift required inquiry into religious doctrine). Accordingly, count II of the plaintiffs’ complaint must be dismissed for want of jurisdiction.
In count III, the plaintiffs allege that the defendants engaged in ultra vires conduct in contravention of the 1898 Deed by investing in speculative ventures and incurring liability beyond the church’s ability to liquidate promptly from its current income. Because this claim may be resolved without reference to ecclesiastical concerns, it is not beyond this court’s jurisdiction. See Jones v. Wolf, 443 U.S. 595, 602 (1979) (courts may resolve church disputes by relying on trust or property law).[13]
Accordingly, defendants’ motion to dismiss is denied as to count III.
Finally, the plaintiffs seek an accounting of the various expenditures made by the defendants (Count IV). Because an accounting of the media venture expenditures is necessarily intertwined with the plaintiffs’ claims in counts I and III, the defendants’ motion to dismiss count IV is denied.
B. Standing
Standing involves the question of “whether the litigant is entitled to have the court decide the merits of the dispute." Warth v. Seldin, 422 U.S. 490, 498 (1975). In order to have standing, the plaintiff must allege “a personal stake in the outcome of the controversy.” Id. at 498. The plaintiff must suffer “some threatened or actual injury resulting from the putatively illegal action.” Id. at 499. Standing focuses on the characteristics of the party bringing suit, rather than on the issues raised in the complaint. Mashpee Tribe v. Watt, 542 F.Supp. 797, 800 (D.Mass. 1982), aff'd, 707 F.2d 23 (1st Cir.), cert. denied sub nom. Mashpee Tribe v. Clark, 464 U.S. 1020 (1983). In dealing with a motion to dismiss for lack of standing, the trial court must accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party. Warth v. Seldin, 422 U.S. 490, 501 (1975).
The defendants assert that the plaintiffs lack standing. In support of this assertion, the defendants contend that The Mother Church is a charity under Massachusetts law and that, pursuant to G.L.c. 12, §8, the Attorney General has exclusive jurisdiction over the instant action.[14] In opposition, the plaintiffs contend that, as members of The Mother Church in good standing, there “is a real and substantial basis for distinguishing them from the public at large.” PI. Br. at 19. Moreover, as beneficiaries of The Mother Church and its various trusts and bequests, the plaintiffs assert an interest distinct from the general public.
While the Attorney General has the exclusive function of preventing abuses in the administration of funds given to public charities; Elias v. Steffo, 310 Mass. 280, 284 (1941); see also G.L.c. 12, §8; a private plaintiff possesses standing where his interests are distinct from those of the general public. See Lopez v. Medford Community Center, Inc., 384 Mass. 163, 167 (1981) (allegations that defendant charity was being managed in violation of its corporate by-laws regarding membership were properly before court). “The public interest must be directly and essentially, rather *527 than remotely and accidentally, involved as to some distinct issue in order to prevent the cause from proceeding to a decision without the presence of the Attorney General as a parly.” Eustace v. Dickey, 240 Mass. 55, 86 (1921).
In the instant case, the individual plaintiffs, as members of The Mother Church, have entered into a contract with the church. See Lopez v. Medford Community Center, Inc., 384 Mass. 163, 168 (1981) (corporate by-laws constitute a contract between the church and its members); accord Jessie v. Boynton, 372 Mass. 293, 303 (1977); Mitchell v. Albanian Orthodox Diocese in America, Inc., 355 Mass. 278, 282 (1969). Their complaint alleges various contractual breaches by the defendants. Although these breaches relate to the proper administration of church funds, the interests of the individual plaintiffs in the enforcement of the by-laws are distinct from the interests of the general public. See Lopez v. Medford Community Center, Inc., 384 Mass. 163 (1981). Moreover, the public interest in the proper adherence to The Mother Church’s by-laws is neither directly nor essentially involved. Eustace v. Dickey, 240 Mass. 55, 86 (1921). Where, as here, the court’s resolution of the dispute will not directly affect the interests of which the Attorney General in his official capacity is the representative, his absence does not affect this court’s jurisdiction. Id. Compare Dillaway v. Burton, 256 Mass. 568 (1926) (donor of property devoted to charitable use had no standing to challenge hospital’s management of funds without the presence of the attorney general); Pilgrim Real Estate, Inc. v. Superintendent of Police of Boston, 330 Mass. 250 (1953) (corporation lacked standing to compel defendant to perform a public duty because the plaintiff did not have a special interest in the subject matter independent of the rights of the public generally); Ames v. Attorney General, 332 Mass. 246, 250 (1955) (only attorney general may sue to protect public charitable trusts and to enforce their proper application).
Plaintiff Members for the Manual, Inc., however, does not have a direct and personal interest in the controversy to confer standing. While the corporation was organized to enforce the by-laws of The Mother Church and to prevent abuses in its governance, the complaint does not allege any rights or interests of the organization which the defendants have or threaten to violate. Warth v. Seldin, 422 U.S. 490, 499 (1975). Accordingly, plaintiff Members for the Manual, Inc. is not a proper party to this litigation.
ORDER
For the foregoing reasons, the defendants’ motion to dismiss is ALLOWED as to Count II of the plaintiffs’ complaint. Defendants’ motion to dismiss is DENIED, however, with respect to Counts I, III and IV. Additionally, plaintiff Members for the Manual, Inc. lacks standing to bring this suit, and is therefore dismissed from the present action.

 Only defendants Harris, Selover, Chaffee, Bergenheim, Carnesciali, Hoagland, and Douglass move to dismiss the Complaint.

 The 1898 Deed is incorporated by reference in the Manual. Pl. Compl. para. 16, citing Manual Art. XXV.

 Except for Honor Ramsay Hill.

 The Mother Church embarked on these media ventures in addition to the already established daily newspaper. The Christian Science Monitor.
With respect to magazine publications, the plaintiffs allege that in 1987, the defendants approved of a monthly magazine. The World Monitor Magazine, the publication of which began in the fall of 1988. Pl. Compl. para. 60-61. The plaintiffs contend that defendants Hoagland and Bowersock falsely represented the number of paid subscriptions, and at the 1988 annual meeting, defendant Hoagland falsely stated that the magazine would achieve a profit within a few years, despite the lack of reasonable basis for such a statement. Pl. Compl. para. 61-63. By the end of the 1992 fiscal year, the defendants acknowledged that the deficits and capital expenditures totalled $36.9 million. Pl. Compl. para. 64. As a result, the magazine was closed down after its May 1993 issue. Id.

 The plaintiffs aver that in the mid-1980s, the defendants also began news radio programming called Monitor Radio. Pl. Compl. para. 65. The plaintiffs assert that while the defendants have not disclosed losses for Monitor Radio alone, reports from June of 1992 indicate that operating and programming losses for shortwave radio and Monitor Radio were $79 million through the end of fiscal year 1992. Pl. Compl. para 67. The plaintiffs contend that the Monitor Radio venture, like the other media ventures, was well beyond the capacity of The Mother Church to afford given the Church’s limited resources. Pl. Compl. para. 67.

 Specifically, the plaintiffs allege that in 1985, the defendants caused The Mother Church to undertake a monthly news program, which became a weekly news program in 1986. Pl. Compl. para. 46. The defendants failed to disclose the true costs and prospects of this program and falsely represented that it would be profitable or break even within three to five years. Pl. Compl. para. 47. In June of 1992, the Directors and Treasurer disclosed that the news program had been running at a deficit of $800,000 per month since 1986, and that The Mother Church had incurred deficits and capital costs of $23.7 million on the program. Pl. Compl. para. 48.
The plaintiffs also allege that in 1986, The Mother Church acquired a television station, Channel 68, WQTV, for $7.5 million. Pl. Compl. para. 41. From its inception, Channel 68 lost a significant amount of money which, according to the plaintiffs, the defendants actively concealed by repeated assurances that the station would become profitable. Pl. Compl. para. 42-43. In June of 1992, the Directors disclosed that the station had lost some $61.7 million from the time of its acquisition, far beyond what The Mother Church could afford. Pl. Compl. para. 44-45.
The plaintiffs further assert that in August of 1987, defendant Hoagland recommended the development of a nightly news broadcast with projected costs between $4.7 and $7.6 million a year. Pl. Compl. para. 49. The defendants represented that the World Monitor News program had reasonable prospects of becoming self-supporting, and launched the program in September of 1988 on the Discovery Channel. PI. Compl. para. 50, 53, 55. During its three and one half years of operation, however, the program earned far below the $ 100 million in internally projected costs. Pl. Compl. para. 57. In January of 1992, the defendants terminated the World Mon *528 itor program, resulting In a total cost to The Mother Church of $84.7 million, net of revenue. Pl. Compl. para. 59.
Finally, the plaintiffs allege that in about 1990, the defendants began planning a new twenty-four-hour cable television station, the Monitor Channel. Pl. Compl. para. 68. The defendants publicly represented that the station would break even within five years, despite failed efforts by the officers of the Publishing Society to interest investors in the cable venture, which should have alerted the defendants that the channel was not economically viable. Pl. Compl. para. 70, 72. Nevertheless, The Mother Church launched the new cable channel on May 1, 1991. Pl. Compl. para. 71. By the end of April 1992, losses and capital expenditures amounted to $89.1 million, which depleted all sources of funding fromThe Mother Church. Pl. Compl. para. 74. After unsuccessful attempts to sell the cable station in March 1992, the defendants terminated the station in April 1992. Pl. Compl. para. 75. The Church Treasurer estimated close-down costs for both the Monitor Channel and WQTV totalling $65.9 million. Id.

 Specifically, the plaintiffs point to the deficit incurred from fiscal year 1987 to June of 1992. While The Mother Church had a surplus of income and contributions over expenditures of $20 million and its unrestricted fund had a balance in excess of $100 million in fiscal year 1987, the media ventures led to deficits totalling $240 million by June 1992. Pl. Compl. para. 89-90. By April 30, 1992, the Church’s unrestricted fund alone had a deficit of $114,698,000. PI. Compl. para. 93. The plaintiffs thus contend that it was or should have been apparent from the continuing large deficits that The Mother Church’s resources were inadequate to support these media ventures, and that they would bankrupt the church. Pl. Compl. para. 92.

 The plaintiffs claim that “[flrom fiscal year 1989 through fiscal year 1992, the defendant Directors then in office, in concert with defendant officers of the media ventures then in office, caused The Mother Church to borrow over $90 million from this Plan to capitalize, and in effect improperly speculate," on the media ventures detailed above. Pl. Compl. para. 78. Additionally, over $22.8 million was transferred from the Pension Plan in 1993 to fund severance costs related to the failed media ventures in exchange for the unsecured obligation of The Mother Church and illiquid real estate. Pl. Compl. para. 84, 85. The plaintiffs contend that the defendants sold securities in the Pension Plan without regard to whether such sales were then prudent or appropriate. Pl. Compl. para. 83-85.

 In their prayer for relief, the plaintiffs seek a declaration that all expenditures of The Mother Church’s funds must be approved by the Finance Committee pursuant to the Manual by-law, Art. XXIV, Sec. 4, and that defendants have and continue to breach the 1898 Deed prohibiting the Publishing Society from engaging in speculative expenditures and incurring liabilities beyond its ability to liquidate promptly from its current income. Additionally, the plaintiffs request an injunction prohibiting the defendants from engaging in the prohibited conduct. Finally, the plaintiffs seek an accounting of all expenditures made on media ventures, all transfers of funds and loans obtained by The Mother Church, all salaries, benefits, travel expenses, gifts, etc. received by the defendants. The plaintiffs also request that the defendants make available to the Finance Committee information regarding each of the Church’s real estate holdings and related financial records as required by the Manual.

 Accord Jones v. Wolf, 443 U.S. 595, 602 (1979); Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710, reh'g denied, 429 U.S. 873 (1976); Natal v. Christian and Missionary Alliance, 878 F.2d 1575, 1578 (1st Cir. 1989).

 “Examination of such documents is not, in and of itself, an impermissible intrusion into the religious realm .-.. Such a proposition could immunize from judicial review actions of religious organizations when those actions are not properly subject to First Amendment protection.” Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 862 n. 10 (1981).

 Where, as here, funds were given to The Mother Church for some specified charitable purpose or for the general purpose of the church, the defendants “hold[ ] the property in trust to carry out the terms and conditions under which it was given and accepted.” Wellesley College v. Attorney General, 313 Mass. 722, 724 (1943). Moreover, property conveyed unconditionally to a charitable corporation is impressed with a trust for the accomplishment of the corporation’s purposes. Wellesley College v. Attorney General, 313 Mass. 722, 727 (1943).

 Section 8 states: "The attorney general shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof.” G.L.c. 12, §8.