Fecteau, J.
These actions are consolidated cases that involve a challenge to the membership and governance of the Northborough Youth Hockey Program, Inc., a non-profit corporation organized under the provisions of G.L.c. 180. In civil action no. 99-02507, the corporation seeks a declaratory judgment, under the provisions of G.L.c. 231A, with respect to the rights of members and directors to vote at annual and/or *108 special meetings and the process by which the corporate by-laws may be amended and directors elected. In addition, the corporation seeks a declaration that the persons purported by the defendants to be “automatic members” are not. In civil action no. 00-0096, certain parents of members of a youth hockey program seek a declaration that recognizes them as “automatic members” of the corporation and that allows them to call for a special meeting, under the provisions of G.L.c. 180, sec. 6A, at which they may elect directors and vote on amendments to the by-laws.
Trial was conducted before me, sitting without jury, on March 28-29, 2000, and May 26, 2000. The parties were allowed to give final summations on June 15, 2000. Upon consideration of the evidence, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
1. The Northborough Youth Hockey Program, Inc. (“NYHP”) is a charitable corporation, duly organized under M.G.L.c. 180, with a usual place of business in Northborough, Worcester County, Massachusetts. It was organized pursuant to Articles of Organization (“Articles”) filed with and approved by the Secretary of the Commonwealth of Massachusetts in February 1970. Exhibit (“Ex.”) 10.
2. The Articles provide that the charitable purpose of the NYHP is to “encourage, organize and direct a youth ice hockey program in the Northborough, Massachusetts area.” (Ex. 10.) There have been no amendments to the NYHP Articles of Organization since they were filed. From the date of incorporation, NYHP encouraged, organized and directed a youth hockey program in the town of Northborough.
3. At the time of incorporation, NYHP adopted by-laws (“Original by-laws”). (Ex. 121.) Other than the officers and directors of NYHP, the Original by-laws did not define membership or who qualifies as a member in NYHP.
4. The practice of NYHP during the period 1970 to 1976 was to consider the officers and directors of NYHP as its members at membership meetings. However, others could potentially become members and even officers or directors; these people did not need to be parents of players in the NYHP hockey program, or even from Northborough, they only needed to demonstrate their interest in NYHP to be permitted to attend the annual meetings. During the 1970 to 1976 period, individuals without any children in the Northboro Youth Hockey Program, including a coach from Shrewsbury, were elected to the NYHP Board and thus became members.
5. In or about 1976, the NYHP purchased the Worcester County Ice Arena, a twin-rink skating facility in Westborough, Massachusetts, which was subsequently renamed the Northstar Youth Forum (“Forum”). NYHP executed a mortgage in connection with that purchase. Although the Articles did not expressly allow for NYHP’s purchase of the Forum, it was purchased to further its charitable purposes as stated in the Articles. Moreover, operating the Forum is found to be reasonably incident to NYHP’s charitable purpose as stated in the Articles and is not inconsistent with the purpose of the encouragement, organization and direction of a youth hockey program in the Northborough area.
6. The original by-laws provided that NYHP members could make amendments at annual or special meetings. As a result of the purchase of the Forum, the NYHP, on the advice of counsel, drafted new by-laws (“by-laws”), which were voted upon and accepted by the members of NYHP at a special meeting on September 8, 1976. (Ex. 11.) This set of by-laws have not been amended since 1976.
7. Section 1 of Article II of the by-laws, captioned OBJECTIVES AND PURPOSES, provides that among the NYHP’s objects and purposes are:
(a) To promote the sports of hockey, figure skating, public skating, and related athletic activities; . . . [and]
(e) To insure the sound management of the buildings and properties owned by the Northborough Youth Hockey Program, Inc.
(Ex. 11.)
8. Section 1 of Article IV of the by-laws, captioned MEMBERSHIP, provides in pertinent part as follows:
Regular; ANY person interested in the objects and purposes of the N.Y.H.P. is eligible for membership in the program and any parent of a player registered in the N.Y.H.P. is automatically a member.
(Ex. 11.)
9. Prior to the meeting at which the by-laws were enacted, officers of NYHP met with NYHP’s attorney, Raymond Giguere (“Mr. Giguere”), to discuss a set of by-laws which Mr. Giguere had drafted. The draft contained some provisions borrowed from a set of by-laws obtained from the Falmouth Youth Hockey Program, which was successfully operating both a hockey program and a rink at that time. One of the specific topics of discussion was the NYHP’s intent to have a broad definition of membership beyond Board members or parents of players registered in the NYHP hockey program. The “Objectives and Purposes” and “Regular Membership” provisions in the Falmouth by-laws were retained in the NYHP by-laws because they were consistent with the independent intent, as expressed by the NYHP Board, to broaden membership, which was discussed with and communicated to Mr. Giguere.
10. The “interested persons” language of the membership provision of the by-laws was intended to allow individuals who did not have children registered in the Northborough Youth Hockey Program, but who were interested in the program or interested in the Forum, and demonstrated their interest through participation, to be members of NYHP. The language was specifically intended to include as members individuals such as Jay Sweet, Eddie Meyer and Steve Jacobs who had already shown their interest and had become *109 members and directors during the 1970-1976 period. The “interested persons” language of the membership provision, as well as the objectives and purposes stated in Article II, was also intended to address a concern of the members and directors that, with the acquisition of the Forum, and the debt that such purchase entailed, the NYHP needed a broader membership base beyond just parents of NYHP hockey players in order to develop sufficient business for the Forum to service its debt.
11. The 1976 by-laws provide that a Board of Directors, consisting of between 12 and 19 directors, was to be elected by the members at the annual meeting of the members or at a special meeting. The by-laws require that the Directors be members of NYHP (Ex. 11, Art. VI), and that 10 members of the Board of Directors constitute a quorum at a regular special meeting of the Board of Directors. (Ex. 11, Art. VII §3.) The NYHP by-laws also established a Board of Governors of between 5 and 7 members to be elected in staggered three-year terms by the Board of Directors. The Board of Governors are responsible for running the Forum. (Ex. 11, Art. X.)
12. On March 7, 1977, after NYHP purchased the Forum, the Internal Revenue Service (“IRS") issued a determination letter recognizing NYHP as a tax-exempt organization under §501 (c)(3) of the Internal Revenue Code (“501(c)(3)”). (Ex. 34.) In connection with NYHP’s application for tax-exempt status, the corporation reported to the IRS that it had purchased the Forum and reported that “(t]he purpose for entering into the transaction was to provide the children of the Town of Northboro with a good skating facility close to their homes and reasonable hours.” (Ex. 74, p. N1223.) NYHP also reported that “(i]n order to meet the mortgage commitment, it has been necessary to rent ice time for hockey games, figure skating and public skating.” (Id.). NYHP also informed the IRS that its “(g]ross dues and assessments are basically the cost of operating the Northboro Youth Hockey Program.” (Ex. 74, p. N1226.) Following NYHP’s submission of that information, the IRS on February 14, 1977 issued a letter which provided that “(biased on information supplied, and assuming your operations will be as stated in your application for recognition of exemption, we have determined that [NYHP is] exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code.” (Ex. 34.) On August 22, 1977, NYHP was issued a Certificate of Exemption from the Massachusetts Sales and Use Tax Bureau.
13. At the time the by-laws were adopted, youth hockey in Massachusetts was governed by an organization known as Amateur Hockey Association, Commonwealth of Massachusetts, Inc. (“AHACM”). AHACM, in turn, was affiliated with a national organization known as AHAUS (Amateur Hockey Association, United States). (Exs. 105 & 106.) At the time the by-laws were adopted, NYHP was the only certified AHACM hockey program for Northborough Massachusetts. In 1976, a player registered in NYHP was one whose parents paid dues and assessments into NYHP and who was reported to AHACM as playing in that program. Absent unusual circumstances justifying a waiver from AHACM, any Northborough youngster desiring to play youth hockey in 1976 was required to play in the NYHP program. I infer and so find that the draftsmen of the by-laws, many who were the founders of the NYHP, in using the language in the by-laws which allowed “automatic” membership in the NYHP of “any parent of a player registered in the NYHP,” intended to reference registration in a youth hockey program accredited under the AHACM and directly operated and managed by the NYHP, as it then was doing.
14. During the late 1970s, the Northborough hockey program, like similar youth hockey programs during this time frame, experienced a decline in the number of players. Too few players in a youth hockey program creates problems in that teams cannot be formed to include players of similar abilities. The NYHP Directors entered into discussions with other youth hockey programs regarding combining programs, something that was happening throughout Massachusetts at the time.
15. During the 1978-1979 season both Northborough and Hudson had separate AHACM youth hockey programs in their communities. In or around 1980, Anthony Loureiro from the Hudson youth hockey program and representatives of the NYHP discussed joining the Hudson and Northboro hockey programs. Mr. Loureiro and the Hudson parents recognized that, if there were to be a joining of the programs, it would just be the hockey programs that would be joined, and that no merging of the assets of NYHP and the Hudson program would occur. They also recognized that Hudson parents would not gain any membership rights in NYHP if a new hockey program combining players from Hudson and Northboro were to be formed.
16. After some discussion, parents of players from Northboro and from Hudson decided to form a new hockey program for the 1980-81 hockey season, one entirely separate and distinct from either the NYHP or Hudson programs. The program was called NorthboroHudson Youth Hockey (“Northboro-Hudson Program”). On the advice of counsel, the assets of NYHP as a corporate entity were never merged with the assets of the Hudson program. No Articles of Consolidation or Merger establishing the merger of NYHP and any Hudson entity or program were prepared or filed with the Secretary of the Commonwealth, nor were any offered in evidence in this case. Because the Hudson and Northborough programs were in different districts, the approval of AHACM was required for this combination of programs.
17. Upon the creation of the Northboro-Hudson program, the parents of Hudson players in that program understood that they were not becoming mem *110 bers of the NYHP entitled to participate in its corporate governance. Neither NYHP, nor its Board, operated, directed, or controlled the Northboro-Hudson Program in any way. From time to time, individuals who were members of both the NYHP Board and the Board of the Northboro-Hudson Program would provide information about the Northboro-Hudson Program to the NYHP Board at its meetings. (Exs. 12, 13, 14, 15, 17, 78, 79, 90, 91, 92, 93.) While the Northborough-Hudson Youth Hockey Program was recognized as a separate program by AHACM, the program had no separate corporate existence.
18. Parents of players participating in the Northborough-Hudson Youth Hockey Program did not register in a program called “Northborough Youth Hockey Program, Inc.” or in a program called Northborough Youth Hockey, but registered instead in the Northborough-Hudson Program. Parents of players registered in the Northborough-Hudson Program did not pay any dues or registration fees directly to NYHP for deposit in its accounts; rather, they paid the Northborough-Hudson Program. The NorthboroughHudson Program paid membership dues and/or registration fees directly to the various leagues in which its teams played (such as the American Youth Hockey League), and, the Northborough-Hudson Program, in turn, registered its players in state and national youth hockey associations. The Northborough-Hudson Program had its own Board of Directors, officers and bank account. Since parents of Northborough players registered their children in the new Northborough-Hudson program, not the Original Program (NYHP) which ceased operations in 1980, they were no longer automatic members of the NYHP under its by-laws. After 1980, the NYHP no longer organized or directed a youth hockey program accredited under AHACM.
19. For reasons similar to the joining of the Northborough and Hudson youth hockey programs in 1980, in June 1984, the Board of Directors of the Northborough-Hudson Program approved a merger of that organization with the hockey program from Milford. (Ex. 17.) No Articles of Consolidation or Merger between NYHP and any Hudson and Milford entities or programs were ever filed with the Secretary of the Commonwealth, or offered in evidence in this case. The NYHP Board never voted to approve or disapprove the merger, nor did any merger of the assets of the NYHP with the assets of the Hudson and Milford hockey programs take place then or at any subsequent time. (Ex. 17.) Beginning with the 1984-1985 season, Starhawks Youth Hockey was recognized by AHACM as the youth hockey program for the towns of Northborough, Hudson and Milford. (Ex. 106.)
20. Since 1984, parents of players participating in the Hudson-Northborough-Milford Skating Program (“Starhawks Youth Hockey”) have registered their children in that program, not in NYHP. (Exs. 4, 25.) Since 1984, parents of players registered in Starhawks Youth Hockey have not paid any dues or registration fees directly to the NYHP for deposit in its bank accounts. Since 1984, Starhawks Youth Hockey has not paid any dues or registration fees directly to NYHP for deposit in its accounts. Since 1984, Starhawks Youth Hockey has paid membership dues and/or registration fees directly to the various leagues in which its teams play. (Ex. 53.) Since 1984, Starhawks Youth Hockey has been registered with local, state and national hockey leagues and/or associations under the name “Starhawks Youth Hockey.” (Ex. 4.)
21. Since 1980, no program, including Starhawks Youth Hockey, has been registered with local, state and national hockey leagues and/or associations under the name “Northborough Youth Hockey Program, Inc.” AHACM has evolved into MassHockey which currently governs youth hockey in Massachusetts under the aegis of USAHockey. Today, that organization recognizes specific programs serving all towns of the Commonwealth. Currently, a youngster residing in Northborough who desires to play youth hockey and to become a registered player in MassHockey and USAHockey must play for Starhawks Youth Hockey.
22. Since 1984, Starhawks Youth Hockey has not been operated and is not operated directly by NYHP or the NYHP Board. Starhawks Youth Hockey has its own Board of Directors, Officers, and Rules and Regulations (“Starhawks Rules”). (Exs. 19, 29.) The Starhawks Board of Directors and officers operate in a completely autonomous fashion from the NYHP Board. (Ex. 43.) The Starhawks Board of Directors does not coordinate its activities with those of the NYHP Board. The Starhawks Board of Directors does not communicate on a regular basis with the NYHP Board and there has been little interaction between the NYHP Board and the Starhawks program. The Starhawks Board of Directors does not report on a regular basis to the NYHP Board. The formation of the Starhawks Board of Directors and enactment of its Rules were not approved or authorized in any way by NYHP or its Board.
23. No NYHP Board member or officer has the authority to sign checks on behalf of Starhawks or to use the money in the Starhawks’ checking account for any corporate purpose of NYHP. Only the Starhawks’ Treasurer and President can sign Starhawks’ checks. Neither NYHP nor the NYHP Board exercises any dominion or control over funds deposited in Starhawks’ account. Starhawks’ funds are kept entirely separate from those of NYHP on a day-to-day basis and are not commingled. NYHP pays none of Starhawks’ expenses; Starhawks is financially independent and self-sufficient. The only money flowing from the Starhawks’ checking account into a bank account maintained by NYHP is that paid by the Starhawks to the Forum for practice ice. Starhawks receives income in the form of registration fees or dues assessed to the parents of players participating in the *111 Starhawks Program and through fundraising activities. Starhawks collects its own registration fees or dues and pays its own expenses, including the purchase of practice ice time at the F orum’s regular hourly rate.
24. Until May 1994, the Starhawks’ checking account was in the name “Starhawks Youth Hockey.” In April 1994, Mr. Hodge, Secretary of the NYHP Board and NYHP’s accountant, provided the Starhawks’ Treasurer, Nancy Revellese, at her request, an incomplete Corporate Resolution in the name of Northborough Youth Hockey Program, Inc. Ms. Revellese used the form to open, without Mr. Hodge’s knowledge or consent, a checking account in the name of “Northboro Youth Hockey Program, Inc. d/b/a Starhawks Youth Hockey.” (Exs. 38, 39, 41,42.) While Starhawks’ checking account has, since May 1994, borne the name “Northboro Youth Hockey Program, Inc. d/b/a Starhawks Youth Hockey,” the NYHP Board did not expressly authorize the opening of an account in that name. (Exs. 39, 40.)
25. While for many years NYHP failed to make any filing with the Division of Public Charities in the Attorney General’s office, since 1996, NYHP has filed a Form PC with Public Charities. Those filings identify Starhawks Youth Hockey as among NYHP’s programs and activities. (Ex. 23, p. N1245, N1252.)
26. Sometime in the late 1980s, the Starhawks’ Treasurer began supplying income and expense information to Mr. Hodge. (Exs. 46, 48, 49, 51, 52, 61.) Starhawks Youth Hockey’s income and expenses were not reported on NYHP’s corporate tax returns for the fiscal years 1985 to 1992, nor were they reflected in NYHP’s consolidated financial statements. (Ex. 108 to 112, 114 to 119.)
27. The first tax return on which such income and expenses appears is the FY93 return prepared in 1994. It was added by Mr. Hodge only after he was reminded in April 1994 by Ms. Revellese's request for a Corporate Resolution that the Starhawks had maintained and opened bank accounts under NYHP’s tax identification number and realized that it would be prudent to account to the IRS for all bank account activity under such number. While Starhawks Youth Hockey’s income and expenses were included on the NYHP’s FY93 and 94 tax returns, it was not listed as a “program accomplishment” until the 1995 or 1996 return, when tax preparation software required that it be listed in order to correspond with information as a line item on a schedule to the return. Since that time Starhawks Youth Hockey has been listed as only one of NYHP’s three “program service accomplishments,” with the other two being described as “Northstar Figure Skating Club — Provides Figure Skating Instruction And Competition” and “Northstar Youth Forum — A Twin Ice Surface Skating Facility Dedicated To Providing The Youth & Adults Of The Local Communities With The Best Skating Rink At The Lowest Possible Cost.” (Exs. 2, 95.)
28. The reporting by NYHP on its tax returns of the income and expenses of Starhawks Youth Hockey, and the listing of Starhawks as a program of NYHP was done by Mr. Hodge without express authority from the NYHP Board. This was done purely as a gratuitous accommodation to the Starhawks so as to save the program the expense entailed in incorporating and obtaining tax exempt status from the Internal Revenue Service and to prevent any future difficulties stemming from the established use of the NYHP tax identification number in the event of an IRS audit of the bank account activity of the NYHP. (Ex. 19.) Similarly, Mr. Hodge permitted Starhawks Youth Hockey to use the corporation’s state sales tax exemption number, as his predecessor had, without express authority from the NYHP Board and purely as a gratuitous accommodation. (Ex. 19.) None of these steps were taken by Mr. Hodge with the intent to have Starhawks parents become members of NYHP, nor was he authorized to do so. The Starhawks parents did not become members of NYHP due to any or all of the aforementioned accommodations having been made.
29. The NYHP Board of Directors has not met regularly as a Board since at least 1985. The records of NYHP reflect only one annual meeting since 1985, which took place in October 1989. (Ex. 94.) When it did hold annual meetings, the practice of the NYHP Board of Directors was only to invite the Board of Directors and the Board of Governors to those annual meetings. Those NYHP annual meetings held since 1980 were only attended by a small group of Directors and Governors. (Exs. 78, 90, 91, 17, 93 & 94.) ■
30. While the NYHP Board of Directors has not met regularly since 1985, and then only as the need arose, the NYHP Board of Governors has continued to meet. The Forum’s operations were conducted by the Board of Governors, which met regularly, approximately seven to eight times per year. (Exs. 94, 122, 123, 125.)
31. The Forum encourages, organizes and/or directs a variety of youth hockey programs, events and tournaments, either directly through its employees, or indirectly through programs run by others at the Forum. The Forum schedules and provides ice time to a variety of users, including: (a) the Northstar Hockey League, a 180-team youth hockey league run by the Forum’s General Manager, David Roy, in his individual capacity, to which the Forum has been home since 1973, before its purchase by NYHP; (b) an Adult League run by Mr. Roy; (c) a fall High School “Prep” League also run by Mr. Roy; (d) the Northstar Figure Skating Club; and (e) the Central Massachusetts Figure Skating School. All such activities, conducted at the Forum, further NYHP’s charitable purposes as stated in the Articles and by-laws.
32. The Forum, in furtherance of NYHP’s charitable purpose as stated in the Articles and by-laws, directly *112 organizes and runs an eighteen-team High School junior varsity league, an eight-team High School varsity league, the Northborough Youth Hockey Christmas Tournament (which just celebrated its 25th Anniversary), the Northstar Summer League, and a summer youth hockey camp.
33. Am individual’s interest in the objects and purposes of NYHP as stated in its by-laws does not depend on that person having a direct financial relationship with the Forum or a program operated directly by or at the Forum, but may stem, for example, from that person’s interest in seeing that the Forum provides him or her, and/or his or her child, with a safe, well-maintained environment in which to participate in all aspects of youth and adult ice hockey or figure skating at the Forum.
34. By definition, an individual’s interest in the objects and purposes of the NYHP is subjective, but among criteria that can be utilized to determine interest are active participation and use of the Forum as well as stated expression of interest. While there are no automatic members in NYHP (as a result of the cessation of the Northboro Youth Hockey Program in 1980), the NYHP has a large population of potential members by virtue of the “interested person” language in the by-law’s membership provision, including but not limited to parents of children and adults who are members of the Northstar Figure Skating Club, parents of players in the Northstar Hockey League and its constituent youth hockey programs of which the Starhawks is one, parents of players in the High School JV and Prep Leagues, Northstar Men's League players, coaches, referees, timekeepers, scorekeepers, incumbent members of the NYHP Board of Directors and Board of Governors and NYHP employees.
35. In the late 1980s, the number of children enrolling in youth hockey programs, including Starhawks Youth Hockey, was again in decline. In an effort to develop interest in skating from among those not already interested, the NYHP Board, in January 1990, sent all Northborough residents a flyer inviting them to free family skating sessions in January and February 1990. The flyer invited the recipient to become a member of NYHP, which he or she could do by filling out a membership coupon and returning it to the Forum. (Ex. 82.) The purpose of the flyer was to increase membership and promote the Forum as a community resource, encourage greater use of the Forum and, incidentally, to promote figure skating and ice hockey programs in the area. It is unclear whether simply by filling out and submitting the coupon, the sender would become a member or whether the board would “choose” members from those submissions. It is unclear whether this solicitation generated any new members.
RULINGS OF LAW
At the heart of these cases is the claim by the Knox group of litigants, the Starhawks parents, that they are “automatic” members of NYHP by virtue of the registration of their children in the only accredited youth ice hockey program into which Northborough children can enter and as a direct descendant of the original youth hockey program of the NYHP. They claim a right as members, under the provisions of G.L.c. 180, sec. 6A, to call for and conduct a special meeting of the members of the corporation to consider amending the by-laws of the corporation and to elect directors. The corporate litigant denies: that the Knox litigants are members, automatic or otherwise: that they have any rights under G.L.c. 180, sec. 6A; and that any meeting convened under c. 180, sec. 6A, can consider the amendment of the by-laws or the election of directors, given the by-laws as they are presently written. Moreover, it claims that all persons who participate in the skating programs at the Forum or the parents of minor participants are voting members of the NYHP.
Since this corporation expressly allows for members in addition to officers and directors, and since members have the right to vote at the annual meeting on the election of directors, to become directors and to vote on proposed amendments to the by-laws, among other things, it is necessary to the resolution of this dispute to determine who are currently members and more specifically whether the Starhawks parents are members. According to G.L.c. 180, sec. 2, “member” is defined as “one having membership rights, ... in a corporation in accordance with the provisions of its articles of organization or by-laws.” To determine those rights and who possesses them, the court must look first then to the charter and by-laws of the corporation.
A corporation’s articles of organization establish the purposes and governance of the corporation; corporate articles of organization supercede conflicting bylaws. Russian Orthodox Church Outside Russia v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass.App.Ct. 194, 200 (1993), aff'd 418 Mass. 1109 (1993). See also ER Holdings, Inc. v. Norton Company, 735 F.Sup. 1094, 1097 (D. Mass. 1990) (bylaws are “inferior to . . . articles of organization”). “The by-laws of a corporation are a contract between the corporation and its members.” Jessie u. Boynton, 372 Mass. 293, 303 (1977) (citing cases). The by-laws “define the duties and powers of stockholders and directors with reference to each other and the corporation." Bushway Ice Cream Co. v. Fred H. Bean Co., 284 Mass. 239, 244-45 (1938).
Principles of contract interpretation should be used to interpret corporate bylaws. See ER Holding Inc. v. Norton Company, 735 F.Sup. at 1097. An unambiguous contract must be enforced according to its terms. Id; Schwanbeck v. Federal Mogul Corp., 412 Mass. 703, 706 (1992); Freelander v. G.K. Realty Corp., 357 Mass. 512, 516 (1970). “Itis settled that interpretation of unambiguous language in a written contract is a *113 question of law for the court, and if the words of a contract are plain and free from ambiguity, they must be construed in accordance with their ordinary and usual sense.” Edwin R. Sage Co. v. Foley, 12 Mass.App.Ct. 20, 28 (1981).
On the other hand, if the language in the contract is “reasonably subject to more than one interpretation!, it] is therefore ambiguous.” Bates v. John Hancock Mutual Life Insurance Company, 6 Mass.App.Ct. 823, 823 (1978). It is a well-established rule of contract construction requiring a court, wherever possible, to give meaning to every word and phrase of a contract and treat none as surplusage if any other construction is rationally possible. Computer Systems of America, 19 Mass.App.Ct. 430, 437 (1985); See also ER Holdings, Inc. v. Norton Company, 735 F.Sup. at 1098 (“Under Massachusetts contract law, the by-laws must be read as a whole so that, if possible, provisions are harmonized with one another”). “To enable us to understand the subject matter of the agreement, to the extent it is doubtful or ambiguous, we resort to the conduct of the parties to determine ‘the meaning that they themselves put upon any doubtful or ambiguous terms . . .’ ” Lembo v. Waters, 1 Mass.App.Ct. 227, 233 (1973) quoting JRizzo v. Cunningham, 303 Mass. 16, 21 (1939); See also Massachusetts Municipal Wholesale Electric Co. v. Town of Danvers, 411 Mass. 39, 59 (1991) (“The conduct of the parties after the signing of the agreement is also indicative of their intent”), quoting Martino v. First Nat’l Bank of Boston, 361 Mass. 325, 332 (1972); Martino v. First Nat’l Bank of Boston, 361 Mass. at 332 (“There is no surer way to find out what parties meant, than to see what they have done”), quoting Pittsfield & North Adams R.R. v. Boston & Albany R.R., 260 Mass. 390, 398 (1927). “The rule of construction that contract ambiguities must be resolved against the drafter ‘must give way to the primary and inflexible rule that . . . , contracts, are to be construed as to ascertain . . . , the true intention of the parties.’ ” Hubert v. Melrose. Wakefield Hosp., 40 Mass.App.Ct. 172, 177 (1996), quoting Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981).
The proper interpretation of a contract is one which accords with justice, common sense and the probable intention of the parties. See Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701 (1964); Bowser v. Chaltfour, 334 Mass. 348, 352 (1956); USM Corp. v. Arthur D. Little Sys., Inc. 28 Mass.App.Ct. 108, 116, review denied, 406 Mass. 1104 (1989) (contract to be interpreted “as a whole, in a reasonable and practical way, consistent with its language, background, and purpose”). If a contract is subject to various interpretations, the Court may look to the past conduct and practices of the parties to determine the probable meaning of the ambiguous phrase. Affiliated FM Ins. Co. v. Constitution Reinsurance Corp., 416 Mass. 839, 844-45 (1994).
The 1976 by-laws is the operative document that one must look to now in attempting to define the membership of the corporation. It states in relevant part: “Section 1. Regular; ANY person interested in the objects and purposes of the N.Y.H.P. is eligible for membership in the program and any parent of a player registered in the N.Y.H.P. is automatically a member.”
This court finds, upon either the plain meaning of the phrase “registered in the NYHP,” or from the intent of the draftsmen, that no one is “registered in the NYHP,” and that the Knox group of litigants, the Starhawks parents, and anyone else, are not automatic members. The NYHP no longer registers players and has not done so since approximately 1980 when its own youth hockey program accredited by the AHACM ceased operations and the NYHP ceased its direct organization and management of such a hockey program. The “automatic” membership provision in the by-laws has ceased to be viable.
It does not appear that the Starhawks parents are claiming membership in any other way; none of the Knox litigants suggested that they had applied for or were granted regular membership. Based upon the evidence and the facts found, I am satisfied that they are not present members and do not have any rights under c. 180, sec. 6A, or under the corporate documents. In light of these findings and rulings, there is no longer an actual case or controversy that exists between the parties hereto at the present time and it is unnecessary to declare the proper scope of a meeting called under the provisions of c. 180, sec. 6A. Moreover, given the balance of this discussion, and the opportunity that the corporation will be given to make amendments to its by-laws, such a declaration may become moot or amount simply to an advisory and likely unnecessary opinion.
In determination of the relief sought, especially in terms of prayer no. 1 in the NYHP complaint, in which it urges a declaration that persons participating in skating programs at the Forum are eligible to vote at meetings of the NYHP, it is necessary to determine who is authorized to vote as a member at the present time. The plain meaning of the word “eligible” does not mean that someone who is eligible for membership is a member. Eligibility implies qualification for membership but does not imply the convocation of membership. Webster’s Seventh New Collegiate Dictionary defines “eligible” as “qualified to be chosen.” Webster’s Seventh New Collegiate Dictionary 268 (1968). Simply participating in any of the programs or leagues operating at the Forum does not confer membership in this corporation; at most, such participation permits of eligibility. Even with that, simple participation does not necessarily imply interest in the objectives and purposes of the corporation and it does not imply selection. Therefore, those who simply participate in skating programs at the Forum are not members of the NYHP at present.
*114 It is important to note, however, that there is a step missing from the by-laws, a step that would permit transition from eligibility for membership to actual membership. This is more than a simple ambiguity which the court would be permitted to interpret as a matter of law. For the court to determine what this missing step is would amount to the court amending the by-laws by supplying an omitted but necessary procedure. “A court ‘cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its terms.’ ” Fenoglio v. Augat, Inc. 50 F.Supp.2d 46, 52 (D. Mass. 1999) quoting National Medical Care v. Zigelbaum, 18 Mass.App.Ct. 570, 570-76 (1984). In the case of Attorney General v. Commissioners of Norfolk County, 412 Mass. 1012 (1992), the court stated “In Marcelle, Inc., we said that a court will not add a provision where the lease is silent." Id. at 1013 citing Marcelle, Inc., v. Sol. & S. Marcus Co., 274 Mass. 469, 474(1931). This court will not supply a missing procedure to identify and transform persons eligible for membership into members. This court should not and will not impose its will or force its judgment upon the corporation as to whether any selectivity should occur at all or how broad or narrow any membership selection process should be.
When the actions of the corporation are examined with respect to the issue of membership, with few exceptions, the court finds that the board has treated its members and the members of the board of governors as the membership. No membership roll or book was offered into evidence. There apparently was no annual solicitation for members with the exception of when a membership campaign that was conducted in 1990. At that time, simply by filling out a coupon, persons interested in becoming members apparently could have become members. There was no evidence offered as to whether it generated any positive response. As of the present, this court is unable to state with any degree of confidence who the members of this corporation may be outside of the members of the board of directors, who, by definition, must be members of the corporation, and possibly the board of governors. This situation leads to a self-perpetuation in office and is counter-productive to the inclusive intent of the draftsmen of the by-laws who wished to open the membership to others besides themselves, which, by law, they did not have to create. See G.L.c. 180, sec. 3. The lack of a systematic and periodic membership solicitation procedure prevents the corporation from learning which members may have lost interest or moved out of the area and prevents it from learning of any potential new members. Moreover, the apparent lack of membership records does not permit the corporation or persons interested in its affairs to become knowledgeable and confident that anyone who becomes a member is being afforded any and all rights of membership, including knowing who is qualified to vote at annual or special meetings.
The inattention to corporate formalities herein are not unlike some of those demonstrated in the case of Lopez v. Medford Community Center, Inc., 384 Mass. 163 (1981). There, the trial court found that the corporation failed to convene annual meetings of members for several years and failed to add to the corporate membership for several years, among other items of malfeasance or nonfeasance. The Supreme Judicial Court, holding that placing the corporation into receivership to correct the failings was too harsh a remedy, remanded the case to the trial court to refashion a more limited remedy. Implicit in that decision is that involuntary dissolution would likewise be too harsh a remedy. What was found therein as an appropriate solution was for that corporation to consider for itself the steps needed to restore proper governance under its charter and by-laws within certain guidelines. The same solution is appropriate herein as well. This will require the corporation, first and foremost, to amend its by-laws, and then to fill the void apparent in the membership Article regarding how persons interested in the purposes and objectives of the corporation may become members. Once that is established, the corporation may then engage in a membership recruitment drive or process over a period of time to allow persons interested in becoming members to become members. Thereafter, the members may conduct annual or special meetings at which other business may be conducted to allow it to conform itself to its by-laws, including further amendments to the by-laws and election of officers and the minimum required number of directors.
According to Article XIV, the by-laws may be amended by a two-thirds vote of the membership present at an annual meeting or by a two-thirds vote of the board of directors at a special meeting of the board called for that purpose. It seems pointless to conduct an annual meeting until the membership by-law is addressed, at the least, and time for membership solicitation and/or selection process to have occurred. The deficiency noted in the by-laws with respect to membership should be addressed first, by the board of directors, so as to allow an open and orderly membership recruitment process prior to the next annual meeting. This will also lead to an expanded pool of candidates for nomination and election to the board of directors. The by-laws, and any actions taken by the board of directors with regard to the by-laws then shall become subject to review by the membership at the annual meeting. Given the time of year, it is reasonable to allow the officers and/or board of directors to take up to 75 days to consider amendments to the by-laws. Thereafter, another 75 days should suffice for a membership recruitment process to occur and a membership roll to be established for the next annual meeting, which should occur no later than December 31, 2000, for which meeting, nominations for a slate of officers and directors that complies with the minimum required by the by-laws should be made.
*115 ORDER FOR JUDGMENT
For the foregoing reasons, a judgment shall enter that declares that the Starhawks parents, represented by the plaintiff Robert Knox et al., are not automatic members of the NYHP, Inc., nor are they or any other persons who may be eligible for membership in the NYHP, Inc. members. Furthermore, the judgment shall order that there be a special meeting of the board of directors, called by the president of the corporation, for the purpose of consideration of the amendment of the by-laws, such meeting to be held by September 15, 2000; that there be membership solicitation to be conducted following any such meeting to occur for a minimum of seventy-five days; and following said membership solicitation period, an annual meeting of the corporation is to take place no later than December 31, 2000, at which meeting a slate of officers and a number of directors be offered that meet the minimum number of directors and officers required by the by-laws.
An officer or director of the corporation is hereby ordered to appear before this court, Fecteau, J., who shall retain jurisdiction over this case, on behalf of the corporation within 10 days after the meeting to be held by September 15, 2000; must appear before this court 80 days after the meeting to be held by September 15, 2000; and must appear before this court no later than January 30, 2001 for the purposes of reporting to the court its compliance with this order.